OVERHOLSER, Superintendent, St. Elizabeths Hospital, v. DE MARCOS.

No. 8902.

United States Court of Appeals
District of Columbia.

Argued Feb. 27, 1945.

Decided April 23, 1945.

Writ of Certiorari Denied June 18, 1945.
See 65 S.Ct. 1579.

See, also, 79 U.S.App.D.C. 397, 147 F. 2d 145.

Mr. Charles B. Murray, Assistant United States Attorney, of Washington, D. C., with whom Messrs. Edward M. Curran, United States Attorney, and John P. Burke, Assistant United States Attorney, both of Washington, D. C., were on the brief, for appellant.

Mr. William E. Leahy, of Washington, D. C., with whom Messrs. Nicholas J. Chase and George A. Parker, both of Washington, D. C., were on the brief, for appellee.

Before MILLER, EDGERTON and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

The respondent, Superintendent of St. Elizabeths Hospital, appeals from an order in a habeas corpus proceeding discharging the petitioner from custody on the ground that petitioner is sane. In his answer respondent states that petitioner has been under the care and observation of physicians on the staff of St. Elizabeths Hospital, to which he was committed in accordance with law, that he is suffering from paranoia to such an extent as to be dangerous to himself and others if released.

■■ At the hearing both the United States Attorney and the court below assumed that the court's function was to weigh the evidence on the sanity of petitioner in order to determine whether he should be unconditionally released and discharged into the community. Since the hearing below, this court, in the case of Dorsey v. Gill, —— U.S.App.D.C. ——, 148 F.2d 857, has reviewed and restated the principles governing habeas corpus in the District of Columbia, considering them in the light of the growing volume of this type of litigation. In that case we said that it is not the function of the judge in habeas corpus proceedings to determine the mental condition of a person who has been committed for insanity. The purpose of such proceedings is rather to determine whether substantial doubt of insanity exists, which requires an order reopening the proceedings under which the petitioner was originally committed to the hospital. In no case should a judge in habeas corpus proceedings order the unconditional release of a person committed for insanity.

■ The reason for this is that the release of an inmate of a mental institution does not depend upon legal standards of responsibility for crime or capacity to make a contract, which a court is qualified to apply. Where, as in this case, the petitioner was duly committed, the issue which must ultimately be decided is whether he has sufficiently recovered from a mental disease so that he may be safely released. Lay judgment on such an issue is of little value. If, despite the judgment of the hospital staff that the petitioner has not recovered, there is a substantial doubt on this question it becomes the duty of the court to see that a new judgment on petitioner's sanity is made according to the procedure laid down in the District of Columbia Code. This procedure requires an examination and report by the Commission on Mental Health.

■ The only question before the court in the present case was whether the evidence raised a doubt as to the validity of the judgment of the hospital staff sufficient to require the reopening of commitment proceedings. In weighing the evidence on this issue it should be remembered that persons legally committed to St. Elizabeths Hospital are presumed to be insane. That presumption goes beyond the familiar principle that a condition of insanity once found is presumed to continue. There is also a presumption that the staff of St. Elizabeths Hospital are competent and that their opinion, based on observation and treatment, is correct.[1] Their determination that a petitioner should not be

---

[1] Cf. Barry v. White, 1939, 62 App.D.C. 69, 64 F.2d 707.

at large because of mental disease, while not an administrative finding of fact, nevertheless must not be lightly disregarded. Such a practice would lead to constant interference with the management of the hospital on habeas corpus proceedings and cast an intolerable burden on the Commission on Mental Health.

■ We are aware of the possibility that the judgment of the hospital staff may be wrong. We also recognize that it is difficult for an indigent inmate to procure expert psychiatric testimony which will contradict the opinion of the staff. For that reason, in the case of DeMarcos v. Overholser [2] (involving this same petitioner), we suggested that an inmate of St. Elizabeths Hospital petitioning for habeas corpus might demand the expert testimony of members of the Commission on Mental Health, or that the court on its own motion might require it. This gives any inmate of St. Elizabeths the protection of a diagnosis by independent experts. But where members of the Commission on Mental Health and the hospital staff both testify petitioner is insane there can seldom be any reason for reopening the commitment proceedings.

■ The case before us illustrates the danger of ignoring the opinion of these two bodies of experts. Two members of the Commission on Mental Health were called who supported the finding of insanity made by members of the hospital staff. The evidence adduced by the petitioner consisted in (1) the testimony of lay witnesses without knowledge of mental disease, and (2) the testimony of a practicing psychiatrist. The lay attendants stated that petitioner's conduct in the hospital was orderly. However, since orderly conduct in mental institutions is the rule and not the exception it cannot, standing alone, be treated as evidence that an inmate should be released. The psychiatrist who testified that petitioner was sane based his opinion on an examination of less than two hours. He did not examine the case history of the petitioner for the astonishing reason that he preferred not to be influenced by the "voluminous amount of material that would take a long time to go through". He said that such records "can act to the disadvantage in that it distorts your original viewpoint".

Nothing in the record raises sufficient doubt as to petitioner's insanity to justify reopening of commitment proceedings.[3]

---

[2] 1943, 78 U.S.App.D.C. 131, 137 F.2d 698.

[3] The testimony of the hospital staff as to dangerous insanity is clear and convincing and is corroborated by petitioner's past record. In 1934 he was sentenced to life imprisonment for homicide in Canada. Two years later he was transferred by the Canadian authorities to a mental hospital. In 1939 he was sent from Canada to St. Elizabeths under an Act to provide for the repatriation of certain insane American citizens. In 1940 he was committed to St. Elizabeths by virtue of a lunacy proceeding in the District of Columbia. He has filed numerous unsuccessful petitions for habeas corpus. In the hospital he was guilty of an assault on one of the staff physicians. In June, 1944, the Commission on Mental Health made an examination and reported that he was of unsound mind and dangerous, "particularly to others". Hospital staff physicians and members of the Commission on Mental Health testified positively as to his dangerous insanity, giving their diagnosis of paranoia and citing the symptoms. For example, they produced a letter written by petitioner in August, 1944, which contained evidence of delusions both of persecution and grandeur. In the letter the petitioner referred to his "great strength of mind and depth of character". He stated that in 1928 he had been called as a star witness for a Royal Commission; that he gave direct evidence over a period of days; that he was cross-examined by the most outstanding lawyers for a period of sixteen days. He wrote in part:

"Tell her for me (and the record of which I speak is now in Washington) that in July 1928 I was called as a star witness before a Royal Commission which investigated the City Government and Police Force of the City of Vancouver, B. C. I gave direct evidence over a period of three days. I was then cross-examined continuously by 14 of the most outstanding lawyers in Canada for a period of 16 consecutive days. When one had questioned me until his tongue gave out, then another would take up, and thus it went through 300 typewritten pages of questions and counterquestions. Now, believe it or not, but the 14 of them failed to contradict me in a single instance.

"The daily papers, Vancouver Province, Vancouver Sun, and Vancouver Star, all of Vancouver, and the Calgary Herald at Calgary, Alta., and Edmonton Jour-

In view of the large number of petitions for habeas corpus from St. Elizabeths Hospital it would cast an intolerable burden on the courts and the Commission on Mental Health, as well as the hospital, to reopen commitment proceedings on such an insubstantial showing.

▮▮▮▮ Because of the frequency of petitions for habeas corpus from St. Elizabeths Hospital we think we should add a word about the conduct of the hearing in this case. Among the witnesses subpoenaed by petitioner were the Superintendent and Assistant Superintendent of St. Elizabeths Hospital, both of whom asked to be excused on the ground that they had no personal knowledge of the case and that their duties at the hospital were heavy. Acting on the theory that it had no discretion in the matter the court compelled both witnesses to attend. This was error. Any witness, improvidently called, may make a showing that he has no relevant information on which he can testify and that his attendance at the trial would be a waste of time. On such a showing the court should require a statement from the party who subpoenaed the witness setting out the evidence he expects to obtain. If it appears that the witness can give no relevant testimony the court should not require his attendance. In exercising this discretionary power the court should resolve doubts in favor of the party calling the witness. But failure to inquire into the matter, where a showing is made that a person subpoenaed has no relevant testimony to give, is an abuse of discretion.

Any other rule would permit an insane petitioner needlessly to waste the time of the court and the persons whom he subpoenas.

▮▮▮▮ During the hearing the petitioner was represented by counsel. Nevertheless the court permitted petitioner to conduct the trial while his counsel sat silent. This is an undesirable practice. Where a party is represented by competent counsel his case should be conducted by that counsel unless it becomes apparent that the interests of justice require the party's active participation pro se. Such circumstances are rare and were not present in this case. The court apparently thought that the interests of justice required it to permit petitioner to examine witnesses because of the opportunity it gave for observation of petitioner during the trial with respect to his sanity. But it is better practice for the court to make that kind of observation by questioning the patient himself. In hearing petitions for habeas corpus brought by persons committed for insanity it should not be forgotten that they are presumed to be insane. When inmates of a mental hospital are permitted to question the members of the staff who are confining them it is difficult to keep such examination under control. This is illustrated by a typical excerpt from petitioner's examination of the Assistant Superintendent of the Hospital:

"Q. Now, do you know of any reason why those under you in rank and official position should on May 9, 1944, take from me two pairs of eye glasses issued to me

nal of Edmonton, Alta., all agreed that I was the most outstanding and the most convincing witness in the history of the Canadian Judiciary. Even the Seattle Times and Seattle Post Intelligencer, both of Seattle, Wash., referred to me as 'a testimonial Gibralter [sic] against which 14 of Canada's crack lawyers had pounded themselves into a ludicrous legal pulp.' Tell Victoria for me that the U. S. Govt. in 1939 sent to Vancouver, at an expense of several hundred dollars, and obtained a copy of the transcript of that case, in the hope that these wisecrackers in D. C. could find in it something to use against me, but when it arrived here it was so bombproof and so much in my favor that they refused to produce it in court here.

"You may tell Victoria that I am thinking very seriously of subpoenaeing that document into court on this round.

"And if she wants to know what happened in Vancouver tell her that of 67 bigwigs of City Govt. and Police Force against whom I gave evidence, all were fired and some went to prison for as much as 5 years. In that long-drawn-out battle (it covered eight weeks) I stood the acid test against 85 microbes and worms who kissed the Bible and swore lies unlimited and against what is said to be the largest battery of lawyers ever arrayed on the defense in a Canadian court. I, of course, was a star witness who had spent more than 18 months and $7,000 of the taxpayers' money in rounding up the evidence. I served a long time as a detective and in God's truth I never lost a case which I launched in court. Call it the Ego if you want to, but I am cocksure because I have been tested and I know myself to the sorrow of many microbes and worms."

by the Government of the United States, which I carried since May, 1939? Do you know of any reason why they should be taken from me? A. I know nothing about it.

"Q. Are you aware they were taken from me? A. No.

"Q. That will come out. I will ask you if stamps are money? Are postage stamps money?

"Mr. Burke. I object to that question.

"A. I don't know.

"Mr. DeMarcos. Your Honor, I have a reason for that. If I don't develop it, I will ask your Honor to have it stricken from the record.

"The Court. I know, but you can develop it without the answer to that question. Proceed.

"Mr. DeMarcos. Well, very well.

"By Mr. DeMarcos:

"Q. Would you say that patients or inmates of that institution should be allowed, if they can find a means of purchasing them, all the stamps they want to mail their own letters? A. Well, I suppose they should be left in the hands of the nurse.

"Q. Why? A. Because of bartering —trading.

"Q. Trading what, stamps? A. Which is meant in that letter, with cigarettes and other things.

"Q. You haven't proved anything. That is merely an allegation. A. No. That is a rule.

"Q. It is an unfounded allegation. A. It isn't an allegation. It is a rule.

"Q. We won't discuss that polemically. Do you know of any reason why I should have had 96 cents worth of stamps confiscated from me on May 19, 1944? A. I know of no reason why, certainly not.

"Q. You do know Dr. Overholser is above you, though, don't you? A. Yes.

"Q. Are you aware upon my complaint to Dr. Overholser those stamps were returned to me? A. I never heard of it. I am not familiar with it.

"Q. I have a copy of my letter to Dr. Overholser. As the result of my complaint to him he ordered those stamps returned. Furthermore, he ordered I be allowed to purchase and have in my possession all the stamps I want to buy. Doctor, is that a form of mental torture or not?

"Doctor, is that a form of mental torture or not? A. I wouldn't think of it as such. I don't know what you are driving at.

"Q. Nothing is mental torture to you, is it? There is little if any chance, Doctor, for inmates of that institution to obtain any weapons from the outside, or any such thing as dope, or poison? A. In Howard Hall, that is the purpose.

"Q. There is little if any chance of their obtaining anything like that in there, isn't there? Can you tell me, then, why it is that we are sometimes shaken down— that is the general term used—searched is another way of saying it—searched as many as three and four times a day? A. I suppose the ones in charge think it is necessary to take those precautions, if they do it.

"Q. It is Dr. Griffin's order. A. Well, Dr. Griffin will be on the stand.

"Q. I am asking you whether you think it is right. You are over Dr. Griffin, too. Now, then, is that conducive to mental recovery and emotional recovery? A. In the first place I don't think it happens, so why should I answer the second question?

"Q. Well, it will be shown it does happen. I am sorry to say it does happen. In the event it is proved that it does happen, will you say it is conducive to mental balance? A. Conducive to mental balance?

"Q. Yes. A. I wouldn't look upon it as a therapeutic agent; no.

"Q. Would you say that it would have a tendency to accelerate or increase the impatience and the temper, arouse the temper of those inmates who are already mentally defective? A. I wouldn't know.

"Q. You are a good psychiatric. Lots of things you don't know. As a matter of fact, if I had absolute authority over you, Dr. Guthrie, and would call you up, and with or without your consent, shake you down from head to toe three or four times a day, would you feel very pleasant about it, Doctor, would you feel very pleasant about it, Doctor? A. I am not being shaken down.

"Q. I am asking you the question, would you feel pleasant about it if you had to be subject to shaking down three or four times a day? A. I object to the question, because I don't think the condition exists.

"Mr. DeMarcos. You spoke of torture. Will your Honor rule whether or not he should answer the question?

"The Court. Technically, the question is not admissible; whether he would like it or not is not the question. The question is whether or not if it happens, whether it is good for a mental patient, or bad. That is the question.

"Mr. DeMarcos. That is the point, the whole thing at issue, whether or not it is good for a mental patient. My contention is, it is not. I am prepared to prove it happens regularly and persistently."

The judgment of the court below is reversed and the case remanded with directions to enter an order dismissing these proceedings and restoring petitioner to the custody of the respondent.

Reversed and remanded.