**HIGGINS v. McGRATH, Attorney General, et al.**

**No. 6932.**

United States District Court
W. D. Missouri, W. D.

July 9, 1951.

---

672

James P. Aylward, Jr., Kansas City, Mo., for petitioner.

Sam M. Wear, U. S. Atty., Sam O. Hargus, Asst. U. S. Atty., Kansas City, Mo., for respondents.

RIDGE, District Judge.

Petitioner, now confined in the United States Medical Center for Federal Prisoners, at Springfield, Missouri, perforce a "judgment and commitment" entered pursuant to the provisions of Sections 4244 and 4246, Title 18 U.S.C.A., seeks writ of habeas corpus to require "the Government to show cause * * * why petitioner should not be forthwith released from custody" or "why it should not forthwith * * * proceed with a trial" of criminal charges pending against petitioner in the United States District Court for the Southern District of California.

June 7, 1950, an indictment was returned against petitioner, charging him with mailing scurrilous and obscene matter through the United States mail, in violation of Section 1718, Title 18 U.S.C.A. Subsequent to his arrest and arraignment on said charge, the entering of a plea of "not guilty" thereto, a hearing was had in the court in which the indictment was returned, on the issue of petitioner's sanity. After said hearing, the following "judgment and commitment" was entered by that court, on September 25, 1950:

"The matter inquiring into the sanity of the defendant, John Michael Higgins, charged with the commission of a federal offense, having duly and regularly come on for hearing before the Honorable David Ling, United States District Judge, on Tuesday, September 5, 1950 at the hour of 10:00 a.m., and there having been appointed and there representing the defendant, attorney Theodore A. Chester, and the United States of America having been represented by and through its attorneys Ernest A. Tolin, United States Attorney, and Norman W. Neukom, Assistant U. S. Attorney; both oral and documentry evidence having been introduced at said hearing and the United States of America having called two qualified psychiatrists, namely, Theodore Parkin, M.D., and Edwin E. McNeil, M.D., and the defendant having called one witness on his own behalf and having taken the stand and testified in his own behalf; and the matter having been submitted to the court on said day and the court being fully advised in the premises;

"The court finds the defendant, John Michael Higgins, to be at the present time an insane and mentally incompetent person, and further finds that the defendant is unable to make a defense to the herein charge.

"It Is Therefore Ordered and Decreed that the defendant be, and he is hereby, committed to the custody of the Attorney General until the said defendant shall be-

come mentally competent, or until such further order of this court.

"The United States Marshal is hereby directed to take the defendant into custody to comply with the terms of the herein order."

Thereafter, on December 15, 1950, the Director of Prisons, acting for and on behalf of the Attorney General, designated the United States Medical Center, at Springfield, Missouri, as the place of confinement of petitioner under said "judgment and commitment." Pursuant to that direction, petitioner was delivered into the custody of respondent on December 20, 1950, and now remains in such custody.

█ Petitioner challenges the right of respondent to retain custody of him under the aforesaid judgment and commitment on several grounds. In support of his prayer to be "forthwith released from custody," it is petitioner's contention, tersely stated, that the "judgment and commitment" under which he is now confined, and Sections 4244 and 4246, supra, are unconstitutional, illegal and void, in that they authorize his detention by federal authorities merely because of insanity; that there is no police power in the Federal Government to confine citizens of a state, who have not been convicted of a federal offense, merely because of insanity; and under the circumstances here established petitioner cannot be held responsible for having committed a crime against the United States; therefore, he claims he is entitled to his immediate release from custody. The proposition so presented is chiefly premised on psychiatric testimony to be found in the instant record, to the effect that at the time of the commission of the offense with which he stands charged, as well as at the time of the hearing on the issue of his sanity, petitioner is said to be mentally incompetent and incapable of knowing right from wrong. Interesting as the constitutional question so raised by petitioner may be, we do not believe that it is necessary to a determination of the instant proceeding that such matter be now resolved in the manner and form as here presented. The case at bar may be disposed of without reaching that proposition. Courts will not pass on the constitutionality

of an Act of Congress if a decision can be justly and reasonably reached in a given action without so doing. Driscoll v. Edison Light & Power Co., 307 U.S. 104, 59 S.Ct. 715, 83 L.Ed. 1134.

The question raised by petitioner assumes that the aforesaid "judgment and commitment" is a final and conclusive determination of the insanity of petitioner, not only at the time his sanity was placed in issue before the District Court in California, but also as of the time of the commission of the offense with which he is charged. Such is not the legal effect thereof. As revealed therein, the finding upon which said "judgment and commitment" is premised is that petitioner, at the time of the inquiry into his sanity, was then "an insane and mentally incompetent person (and) * * * that defendant is unable to make a defense to the charge" then pending against him. The finding so made does not purport or undertake to adjudicate the insanity of petitioner as of the time of the commission of the offenses with which he stands charged.

█ In criminal procedure, the question as to whether one is so insane that he cannot stand trial for a criminal offense is distinct from the question and issue to be determined as to the mental capacity of an accused, as affecting his guilt. Generally speaking, the issue presented as to the insanity of one about to be tried for a criminal offense is whether the accused has sufficient soundness of mind to appreciate the nature of the charges made against him and the proceedings thereon, or whether he is so mentally impaired as to render it probable that the accused cannot, as far as may devolve upon him, have a full, fair and impartial trial. 23 C.J.S., Criminal Law, § 940, p. 231, etc.; 14 Am.Jur., Sec. 45, p. 802. The question to be resolved in such a proceeding is whether the accused is mentally incompetent to make a rational defense, and not as to his responsibility for the crime charged. The latter question involves an inquiry as to whether the accused knew the difference between right and wrong as to the charge made against him, and could distinguish the quality and consequences of his act in reference thereto. A verdict or finding as to an accused's sanity and mental

674

capacity to stand trial is conclusive only of his mental state at that time. Such a verdict and finding is not conclusive of the mental competency of the accused at the time of the commission of the offense. Cf. Annotation 3 A.L.R. 94.

Sections 4244 and 4246, supra, under which the instant "judgment and commitment" was entered, insofar as they prescribe procedure for determining the insanity of persons accused of a federal offense, and authorizing their incarceration if found insane, for a reasonable period of time, until they are restored to sanity, cannot be of even doubtful constitutionality. Said sections are merely enactments by Congress, into the Federal Criminal Code, of the rule to be found at common law, and in many state statutes, relating to recognized criminal procedure. It is a principle deeply rooted in the common law, and in federal and state criminal jurisprudence, that if a person be so insane at the time he is brought to trial for the commission of a crime, he may be confined by the sovereign having jurisdiction of the crime, after his arrest therefor, until his sanity is restored so as to permit him to stand trial thereon. 4 Blackstone Comm. 395; 44 C. J.S., Insane Persons, § 130, p. 285, etc.; Youtsey v. United States, 6 Cir., 97 F. 937; United States v. Harriman, D.C., 4 F.Supp. 186. The right of a sovereign to proceed against an insane person charged with the commission of a felony is incidental to the power to define crimes and prescribe procedure under a criminal code. Cf. Ex parte McWilliams, 254 Mo. 512, 164 S.W. 221. So far as that power is resident in the Federal Government, it can be traced to Art. 1, Sec. 8, Cl. 18, of the Constitution of the United States, relating to "incidental powers." Cf. United States v. Fox, 95 U.S. 670, 24 L.Ed. 538; United States v. Lawrence, 26 Fed.Cas., page 887, No. 15,577; United States v. Chisolm, 5 Cir., 149 F. 284. We need not pursue that matter further. Suffice it to say that an insane person who is charged with a federal offense and has been arrested therefor, is for purposes of trial and judgment thereon within the lawful custody and control of the Federal Government. If the requisites of due process

are thereafter satisfied, the Federal Government has the right and power to determine the issue of the mental capacity of such an accused, not only to stand trial, but also the question of his competency to commit the offense with which he is charged. Due process is evident and appears to have been met from the provisions of the instant judgment and commitment. In light of the foregoing, we believe that petitioner's original commitment to the custody of respondent as above revealed was not unconstitutional, illegal, or void, and that it is unnecessary to further determine the remaining constitutional question now raised by him.

Petitioner further contends that he is now mentally competent and able to "evaluate the nature and scope of the charges pending against him," and that "he can very ably serve in preparing and conducting a defense" thereto. As a consequence, petitioner seeks to have this court determine in the instant proceeding that he is so mentally competent; and, that this court direct that he be returned to the court of his commitment for trial on the charge now pending against him.

In a habeas corpus proceeding such as the instant one, we do not believe that it is the function of this court to determine with finality the mental condition of a person who has been committed to the Medical Center pursuant to the provisions of Section 4246, supra, or that he is mentally competent to stand trial on charges pending against him. The only court that may determine that fact is the court having jurisdiction of such charge. In a habeas corpus proceeding such as the one at bar, we can only determine whether substantial doubt of insanity exists when measured from a consideration of legal standards of responsibility for crime, which requires, in the opinion of this court, an order reopening the proceedings under which the petitioner was originally committed, for a redetermination of his sanity. In such a situation, if despite the judgment of the hospital staff that petitioner has not recovered, or that he does not possess mental capacity to stand trial for an offense, there is substantial doubt on that question from a consideration of criminal legal standards, it becomes the

duty of this court to see that a new determination of the petitioner's sanity is made, and, for that purpose, a writ of habeas corpus may be granted, commanding the return of petitioner before his committing court. The sole object of such inquiry before this court is to determine whether or not accused has probably recovered his sanity so that he may now possibly stand trial for charges pending against him. It must be remembered that those committed under said statutes are not convicted of any offense, that they are entitled to be discharged from custody, and admitted bail, upon restoration of their sanity; and, that such persons have a right to have the question of their sanity considered and determined whenever there is reasonable cause to believe that sanity has been restored to them. How frequently that matter may or should be inquired into by the courts "depend, in each case, upon the petition presented, the type of insanity for which the petitioner was originally committed, the time elapsed since the last inquiry and other considerations upon the record, of which the judge is required to take judicial notice." Dorsey v. Gill, 80 U.S.App.D.C. 9, 148 F.2d 857, 865; cf. Overholser, etc. v. De Marcos, 80 U.S.App.D.C. 91, 149 F.2d 23.

After petitioner was committed to the custody of respondent, and physical and psychiatric examinations had been made of him by Dr. Wayne Glotfelty, the Senior Assistant Surgeon of the Medical Center, a neuro-psychiatric evaluation was filed by that officer on February 5, 1951. (A copy thereof is attached to respondent's Return.) At that time, final diagnosis of petitioner's mental status was deferred until receipt of additional information relating to "the findings of the two psychiatrists who examined (petitioner) in Los Angeles." Thereafter, on March 6, 1951, Dr. Glotfelty made a final report and diagnosis concerning petitioner's sanity, as follows:

"The following additional information has just been received concerning the subject from doctors Edwin E. McNiel and Victor Parkin who examined the patient by court order.

"In the summary of Doctor Edwin E. McNiel's psychiatric examination, the following is found: 'At the time I examined this man he was oriented. Throughout the examination there were repeated references to his belief that people had worked against him. He applied this theory to his two wives, to his experiences in the Army, and to forces working against him in his business and legal difficulties. He probably has no insight into the nature and extent of his paranoid delusions. While he is a man of considerably more than average intelligence, and is familiar with many of the laws in which he is involved, much of his behavior is motivated in a basis of his paranoid delusions.

" 'In my opinion this man is mentally ill and has been so for several years. In my opinion he was legally insane at the time of the commission of the alleged acts and at the time I examined him. From the information made available to me, he has not carried out any threats, nor has he been aggressive in the past. However, in my opinion he is a potentially dangerous individual.'

"In the summary of Doctor Victor Parkin's psychiatric examination, the following is found: 'It is the examiner's opinion that Higgins is not a case for criminal prosecution, as punishment by incarceration in jail will not rid him of his false beliefs. On the contrary, it will convince him that he is right. I am unable to gather from the defendant that he has at any time had thoughts of revenge by any form of violence, and in my opinion he is not a menace from that standpoint. He has implicit faith in the reality of his beliefs and the prospect for recovery is doubtful. His mental condition is such that he is not criminally responsible for his behavior in connection with the defamatory letters he wrote. Diagnosis: insane.'

"From the previous psychiatric examinations and our own psychiatric examinations and observations, this man remains psychotic and mentally incompetent. He does not know right from wrong nor can he defend himself or accept the advise of counsel.

"Diagnosis: 001–X24, schizophrenic reaction, paranoid type.

"Recommendation: It is doubtful if shock therapy will be of benefit in this case due to the chronic course of his illness."

June 1, 1951, the Board of Examiners of the Medical Center, pursuant to directive issued by Director of Bureau of Prisons, undertook to make a psychiatric examination of petitioner for the purpose of a progress report concerning his mental status. At said examination, the following occurred, as shown by the "Report of Board of Examiners."

"In conformity with Bureau directive dated May 10, 1951, Board of Examiners was convened June 1, 1951, in the case of John Michael Higgins, Reg. No. P–17–H.

"An explanation of the membership of the Board, reason for convening, etc. was given to subject. He replied that he did not recognize the Board of Examiners as being qualified legally to review his case as Sections 4244 to 4248 Public Law 285 makes no provision for a Board of Examiners. It was explained to Higgins that the chief interest of the Board was to protect his interests. In spite of this declaration, Higgins declined to answer questions or to be examined by the Board.

"In view of the foregoing, the Board was unable to make a determination of the patient's insanity, other than to review the findings of the following psychiatrists:

"Victor Parkin
417 South Hill Street
Los Angeles 13, California
Report dated August 22, 1951.

"Edwin E. McNeil, M.D.
3875 Wilshire Boulevard
Los Angeles 5, California
Report dated July 14, 1950.

"Wayne Glotfelty
Medical Center for Federal Prisoners
Springfield, Missouri
Report dated March 6, 1951.

"These findings are all in agreement that Higgins is suffering from paranoid schizophrenia and that he is mentally incompetent.

"Recommendation is made that this patient be retained as mentally incompetent in view of the fact that:

"(1) He would not permit Board of Examiners to inquire into the question of his sanity, and—

"(2) Reports of all three psychiatrists who have previously examined subject indicate that Federal Judges Hall and Pierson are involved in his delusional thinking. One examiner (Edwin E. McNeil) considers subject as being a 'potentially dangerous individual'."

In addition to the foregoing, Dr. Glotfelty testified in the instant proceeding, that at the present time petitioner is completely oriented for time, place and persons, but because of the delusions and hallucinations previously found, it is his opinion that his contact with reality is questionable. On psychometric examination made of petitioner, it was found that he had superior intelligence and an I. Q. of 132; such superior intelligence and I. Q. is not unusual in a schizophrenic type of insanity. From other psychiatric tests given petitioner, together with the history obtained, and personal observation made of him, Dr. Glotfelty's conclusion is that from a strict medical viewpoint petitioner is insane, does not now know right from wrong, and, as a consequence thereof, petitioner cannot defend himself of the charge made against him. His opinion as to the duration of such insanity so resident in petitioner, and prognosis thereof, is that it existed at the time of the commission of the offense with which petitioner is charged, and for a number of years prior thereto; and, that it is a permanent status from which petitioner will not improve or recover. On examination by the court as to a consideration of petitioner's present sanity and ability to stand trial, measured from criminal legal standards, the Doctor very commendably stated that he could not venture an opinion thereon.

Petitioner's testimony is to the effect that he presently understands he is charged by indictment, pending in the United States District Court for the Southern District of California, with having used scurrilous language on postal cards and sent the same through the mails in violation of Section 1718, of the Criminal Code; that he was

taken into custody on said charge in the State of Nebraska by Postal Inspectors, and first arraigned thereon before a United States Commissioner at Omaha, Nebraska, where he waived hearing on extradition and was transported to Los Angeles, California, where he was arraigned, on June 19, 1950, before the court in which the indictment returned against him was pending; that he entered a plea of "not guilty" thereto, and secured his release on bond for later appearance in that court. While out on bond, petitioner was ordered to be examined by the psychiatrists named in the above "judgment and commitment," and after the hearing held on the issue of his insanity his bond was revoked and he was taken into custody by the Marshal of the District Court having jurisdiction of the charge pending against him. While he was in the custody of said Marshal petitioner sought release by way of petition for writ of habeas corpus, filed in the United States District Court for the Southern District of California, and after hearing thereon he was remanded to the custody of said Marshal and then removed to the Medical Center. Other matters elicited by petitioner's testimony reveal that he apparently has full knowledge and memory of the circumstances relating to the commission of the offense with which he is charged. To direct questions propounded by his counsel, it is petitioner's testimony that he presently knows right from wrong, and, in his opinion, he is capable of advising with counsel concerning any defense to be made to the charges now pending against him. From his appearance as a witness in the instant proceedings, petitioner presents himself to the court as a person of intelligence, lucidly and logically making answers to all questions propounded to him by court and counsel. No item of his testimony demonstrates or reveals to this court, as a layman, that petitioner was at the time of the instant hearing suffering from any delusions or hallucinations, whatever. Petitioner's testimony, taken as a whole, and his appearance before the court, reveal that he is fully oriented as to the instant proceedings, and as to the nature and cause of his present confinement. That he presently has a realization that the acts with which he is charged by indictment are in violation of law; that for such violations he may be subjected to punishment; and that before being so punished, if he is punished, he has the right to a trial on the merits thereof, at which his sanity may be placed in issue, is the only conclusion that can be reached from his testimony. Prior to the institution of the instant action, petitioner testified that he made request of the Board of Examiners of the Medical Center to be returned to the court in which the indictment is pending against him, for trial, so that his status as a mental incompetent may be finally settled and determined, and said request was refused.

When the instant writ of habeas corpus was issued, the court appointed counsel to aid petitioner in the presentation of his testimony to the court. Petitioner apparently was mentally able to consult with such counsel and advise with him concerning the instant proceeding. However, because counsel so appointed for petitioner would not permit petitioner to direct the course of his examination of Dr. Glotfelty, which was the proper thing for counsel to do, see Overholser v. De Marcos, supra, petitioner has now filed a motion with the court, asking that said counsel be forthwith dismissed and petitioner be permitted to further prosecute this action *pro se*. The assignments given by petitioner in said motion for such action are not presently pertinent. Since then, petitioner has also filed with the court a typewritten document covering fifty-six (56) pages, which he entitles, "Evidence per Affidavit to Support Oral Testimony of Petitioner" given at hearing on writ of habeas corpus. This last-mentioned document presents a detailed statement of the personal life history of petitioner, including detailed background and facts concerning the commission of the offense with which he stands charged. We shall not begin to summarize the contents of either of said documents. Suffice it to say that the documents so filed may, from a medical standpoint, lend some support to the testimony of Dr. Glotfelty, that petitioner is suffering from specific delusions of persecution; on the other hand, they reveal

that petitioner is fully cognizant of his present predicament, has a memory of all material details thereof, knows the nature of the charge made against him, and if the facts therein stated were revealed to counsel representing petitioner at the trial on said charges they would afford ample material to enable counsel to prepare a defense thereto, if petitioner has such a defense. Doctor Edwin E. McNeil, in his report, supra, states that petitioner "is a man of considerably more than average intelligence, and is familiar with many of the laws in which he is involved." We believe, from all the reports herein and the testimony considered as a whole, that such is the only conclusion that can legally be reached concerning petitioner's mental condition, that any insane delusions or hallucinations with which petitioner is now afflicted, produce only partial insanity in petitioner; and, that the partial insanity under which he is laboring is not such as will probably prevent petitioner being tried on the charges now pending against him. In 22 C.J.S., Criminal Law, § 60, at page 126, it is said: " * * * Even though a person may be laboring under partial insanity, or suffering from some insane delusion or hallucination, still if he understands the nature and character of his action, and its consequences, if he has knowledge that it is wrong and criminal, and that if he does the act he will do wrong, such partial insanity or the existence of such delusion or hallucination is not sufficient to relieve him from responsibility for his criminal acts." (See cases there cited.)

Whether the insane delusions of petitioner enter into the commission of the crime with which he is charged, is a matter for determination by the trier of the facts on the issue affecting petitioner's guilt. If such fact exists, petitioner is entitled to have that matter determined. Standing alone, it should not, in our opinion, under the present evidence, prevent petitioner's trial on charges now pending against him. United States v. Chisolm, supra.

Pursuant to directive of the Director of Prisons, "when a person is committed to the custody of the Attorney General as insane or mentally incompetent under the provisions of Section 4246, Title 18 U.S.C. A., a complete psychiatric examination (is) made and a report of the Board of Examiners submitted to the Director within ninety days from the date of commitment." The report so made includes a determination of the accused's insanity or mental competency, and contains recommended action by the Board of Examiners, as to whether (1) accused should be returned to court as being no longer insane or mentally incompetent; (2) should be returned for further observation; (3) returned for treatment as psychotic or otherwise mentally incompetent; or (4) transferred to a state hospital for mentally ill in the state of the accused's residence. The aforesaid determinations as made by the above Board of Examiners are apparently premised wholly upon a consideration of medical and not legal standards of insanity. As a consequence thereof, a difficult problem of judicial administration is presented in habeas corpus proceedings such as the case at bar. In all due respect to the decisions of the Board of Examiners so made, we believe that to protect against any possible miscarriages of justice, we must examine into the mental competency of petitioners in cases of this kind, and if we believe that it appears from a legal standpoint they are capable of standing trial on charges made against them, we must order such persons returned to the courts of their commitment for a redetermination of that fact. Cf. Barry v. Hall, 68 App.D.C. 350, 98 F.2d 222.

From the foregoing, it appears that petitioner's original commitment to the custody of respondent was legal. Since that time, petitioner has apparently regained his sanity to such an extent that he can now probably stand trial on charges pending against him. A final determination of the fact can only be made by the court of his commitment. Petitioner is not entitled to his discharge from all custody until a redetermination of his sanity to stand trial has been made by that court.

It Is Ordered that petitioner be returned to the court of his commitment, within all due dispatch, for the purpose aforesaid.