David H. WHITTLESEY, Pamela C. Haynes, Marta C. Kusic, Carol J. Lawson, Jessie W. McQueen, Sheila P. Ryan, and Robert E. Wooten, Appellants,

v.

UNITED STATES, Appellee.

No. 3798.

District of Columbia Court of Appeals.

Argued March 14, 1966.

Decided July 5, 1966.

Rehearing Denied Aug. 9, 1966.

88

Herbert O. Reid and Frank D. Reeves, Washington, D. C., for appellants.

Thomas Lumbard, Asst. U. S. Atty., with whom David G. Bress, U. S. Atty., Frank Q. Nebeker and Robert E. Jordan, III, Asst. U. S. Attys., were on the brief, for appellee.

Before HOOD, Chief Judge, and QUINN and MYERS, Associate Judges.

HOOD, Chief Judge.

On March 11, 1965, appellants entered the White House through the "tourist line" during the regular visiting hours between 10:00 a. m. and 12:00 noon. At 11:15 Major Stover, the Commanding Officer of the White House Police, found twelve people, including appellants, seated in the hallway in front of the library in such fashion as to block off the tourists from the ground floor corridor. He told the group to move but their spokesman replied that they would "stay right there until the President did something about the situation in the South." They were told that if they did not move they would be arrested for unlawful entry. They refused to move and as a result the tourist line was stopped and all tourists cleared from the White House. The group remained in the corridor in front of the library until about 1:10 p. m. when they told Major Stover they were ready to leave. He led them toward an exit but when they reached the foyer they "planked down on the floor again" and remained there "until when they were actually carted off" shortly after 6:00 p. m. At about 2:30 in the afternoon Major Stover again appealed to the group to leave telling them that unless they did leave they were going to be arrested. Two of the younger members of the group did leave but the others refused. Later in the afternoon three White House Administrative Assistants appealed to the group to leave, telling them that they were accomplishing nothing. They remained. Their conduct went from "silence to extremely loud and boisterous—singing at times." At 6:00 p. m. Major Stover again asked the group to leave and several replied they would not leave "until something was done in Selma, Alabama." Major Stover then ordered them to leave and when they refused they were arrested and forcibly removed. At that time there were ten in the group, seven adults and three minors. The seven adults, appellants here, were charged and convicted under our unlawful entry statute.[1]

Appellants advance numerous grounds which they say require reversal.

---

[1]. D.C.Code 1961, § 22–3102. Unlawful entry on property.

Any person who, without lawful authority, shall enter, or attempt to enter, any public or private dwelling, building or other property, or part of such dwelling, building or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful ocupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $100 or imprisonment in the jail for not more than six months, or both, in the discretion of the court.

They argue that when the unlawful entry statute was amended in 1952 to include any public building, it was not the intent of Congress that the White House come within the coverage of the statute. However, it is plainly shown by the legislative history of the Act that it was the intent of Congress that the Act extend to all buildings and property owned by the District of Columbia or the United States.[2] We take it that no one would dispute the testimony that the White House is owned by the United States. We are satisfied that Section 22–3102, by itself, applies to all public buildings, i.e., government buildings in the District of Columbia, including the Executive Mansion.

■ Appellants contend that Section 22–3102 can be applicable to the present case only by authority of D.C.Code 1961, § 4–120,[3] enacted in 1892, and that it was not intended by the Act of 1892 to assimilate future enacted statutes. The broad language of the statute suggest otherwise; and we see no obstacle to such assimilation, if such be necessary.[4] But, as we have said, Section 22–3102, standing alone, applies to the White House, and the existence of Section 4–120 only serves to emphasize that application.

Appellants argue that Section 22–3102 cannot constitutionally apply to the White House because either (1) the President is the sole lawful occupant or person lawfully in charge, or (2) if not, then appellants could not know who was such person with authority to order them out, and thus Section 22–3102 as applied to the White House is void for vagueness.

■ Their first argument under this point seems to be that only the President could order them to leave the White House. We reject this argument.[5] It would be highly unreasonable to hold that in a public building there is only one person, the one with senior authority, who is lawfully in charge. Major Stover, the commanding officer of the White House Police and responsible for the security of the building, clearly had authority to order appellants to leave when they violated the regulations respecting visitors at the White House. We find no vagueness in the statute as applied here. When appellants entered the White House as tourists they passed a sign informing them of the regular visiting hours. When they sat down and refused to move after being urged to leave by not only Major Stover but also the Presidential Assistants, they were fully aware that their continued presence in the White House was unlawful and that they could be arrested for remaining. They deliberately refused to obey a lawful order to leave and invited their arrests.

■ Appellants also claim error with respect to the trial court's denial of their motion that subpoenas issue for four Presidential Assistants, namely, George Reedy, William Moyers, Lee White and Clifford Alexander. Moreover, appellants say these four men were not subject to subpoena because of "executive privilege" and that trial of appellants, when such men were vital witnesses to the defense, violated appellants' rights to due process of law and compulsory process.

2. See H.R. Report No. 1500, 82d Cong., 2d Sess., March 6, 1952, accompanying H.R. 1758. See also 98 Cong. Record 2062 (1952).

3. "The provisions of the several laws and regulations within the District of Columbia for the protection of public or private property and the preservation of peace and order are extended to all public buildings and public grounds belonging to the United States within the District of Columbia."

4. United States v. Sharpnack, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958).

5. A somewhat similar argument was made and rejected by us in Fatemi v. United States, D.C.App., 192 A.2d 525 (1963), affirmed by judgment of the United States Court of Appeals for the District of Columbia Circuit (No. 18043, March 24, 1964), cert. denied, 377 U.S. 997, 84 S.Ct. 1916, 12 L.Ed.2d 1048 (1964).

The answer to the constitutional question is that the prosecution continually maintained that no claim of executive privilege or immunity for these witnesses was being asserted, and that the objection to the subpoenas was that the request did not come until the day of trial [6] and was then made without a showing that the witnesses sought would give relevant testimony. There is nothing in the record to show that the court's ruling was based on executive privilege. What would have been the case if the Government had claimed immunity for these witnesses and the court had upheld the claim is not a question before us.

It is our conclusion that the motion was properly denied because of failure to indicate the relevance of the expected testimony. The only proffer made by appellants, based upon a newspaper account, was that Reedy had told reporters sometime during the afternoon of the day in question that, "they aren't in any one's way where they are now," and when asked if force would be used to remove the group, replied: "We have no plans; they are just sitting there." We fail to see how the testimony of this witness would have any bearing on the issues in this case. At most it would have served only to corroborate the prosecution's proof that appellants were given more than ample time to leave the White House and avoid being arrested. Appellants suggest that they needed these witnesses because Major Stover admitted that on occasions he took orders from Moyer, Reedy, White and possibly from Alexander. The argument seems to be that possibly one of these men may have countermanded Stover's decision, made around 6:00 o'clock to arrest appellants if they failed to obey his order to leave. Major Stover testified that no one had limited his authority to deal with the situation, and there is nothing in the record to even suggest such a possibility. Appellants had no absolute right to subpoena all Stover's superiors on the pure speculation that one of them might contradict Stover. The trial court did not abuse its discretion in denying the subpoenas.

In connection with the foregoing it may be noted that Miss Ryan, the only appellant who testified, stated that Moyer, Alexander and White talked to the group in the afternoon, asked why they were there, and asked them to leave. The witness admitted that none of the Assistants told the group they could stay as long as they wanted.

■ Another claim of error is that the information went to the jury room without proper instructions by the court and without a determination by anyone as to whether certain papers attached to the information had first been removed.[7] Apparently the fact that the information was taken to the jury room was not known to the court or to counsel until some time after the verdict was returned. The trial court at sentencing said the information had been given "inadvertently" to the jury by the Deputy Marshal.

■ It appears clearly established by the federal courts that when an information or indictment goes to the jury, and the defense counsel requests an instruction to the effect that the jury should not consider the information or indictment as evidence against the accused, a refusal to so instruct is reversible error.[8] The Government points out that no such request was made here, but of course counsel could not make such a request because of lack of knowledge that the jury would be given the informa-

6. The trial occurred nearly two month after the arrest.

7. There is nothing in the record as to the contents of the attached papers. Appellants say that the papers contained "personal data and information" concerning appellants. The Government says the papers were the D. C. Bail Bond Project's recommendations as to three of appellants.

8. United States v. Schanerman, 150 F.2d 941 (3rd Cir., 1945); Little v. United States, 73 F.2d 861, 96 A.L.R. 889, (10th Cir., 1934).

tion. In United States v. Grady, 185 F.2d 273 (7th Cir., 1950), the information and an attached affidavit were given to the jury with the customary instruction that the information was not to be considered as evidence, but without instruction regarding the affidavit which apparently neither court nor counsel realized was being submitted to the jury. This was held to be reversible error.[9] The facts of that case are significantly different from the instant case. There the affidavit was that of a person who did not testify. Here the only affidavit is the formal one at the bottom of the information that Major Stover swore to the truth of the facts set forth in the information. As Major Stover was the chief witness at trial, his affidavit did not have the effect of an added witness being swept silently into the jury room without being subjected to cross-examination in open court.

The reverse side of the information listed as witnesses Major Stover and Officer Lanier, who both testified at trial, and four other White House policemen who did not testify. The jury could possibly have inferred that there were other witnesses who would have supported the Government's case; but in view of the fact that the prosecution had "tendered" these "cumulative witnesses" at trial without objection, we cannot see that appellants were harmed in any way by the jury seeing the names of these witnesses on the information.

We confess to some frustration regarding the papers attached to the information. It is not clear from the record that the papers were still attached to the information when it went to the jury or what these papers contained. While appellants' counsel say the papers contained personal information about several appellants, counsel do not attempt to say what the information was or how it was harmful to appellants. We are not willing to hold that personal information per se is prejudicial, especially where there is no dispute of the factual issues in the case. Here the jury was not required to weigh conflicting testimony on the basis of the credibility of witnesses. The brief testimony of the single defense witness corroborated rather than contradicted the testimony of the officers. The basic question was largely the legal one of whether Major Stover was the person lawfully in charge at the time he ordered appellants to leave. We can perceive no harm resulting to appellants from the information, and possibly the attached papers, going to the jury. We think the following language from the recent case of Jackson v. United States, D.C.Cir., 359 F.2d 260 (decided April 5, 1966) is appropriate:

> Whether there is a reasonable possibility of prejudice, however, should be determined with some reference to the real world of juries and grand juries, and the realm of common sense which must guide the administration of the criminal law and rules of criminal procedure.

Counsel should be informed before an information is sent to the jury so that timely objection or request for an instruction may be made; but in the circumstances of this case we do not find that the inadvertent procedure amounted to such prejudicial error as to require reversal.

Appellants complain that the jury was not properly charged on the elements of "person lawfully in charge" and "necessary intent for trespass." The jury were instructed that they must find beyond a reasonable doubt that the demand to quit the premises was made by a person lawfully in charge, that a person may be lawfully in charge even though there are other persons who could, if they chose to do so, countermand or override his authority, and that with respect to given premises, there may be more than one person who has the authority to order a removal. These instructions conformed to the testimony and correctly stated the legal requirements of the statute.

9. See also United States v. Douglas, 155 F.2d 894 (7th Cir., 1946).

Appellants appear to argue that the jury should have been instructed that the President is the "lawful occupant" of the White House and that only he could demand that appellants leave. This argument ignores the fact that the White House is more than the dwelling of the President. It is also an office building and portions of it have a "museum character." It was into the museum portion that appellants were admitted as tourists. Major Stover, in command of the White House Police and responsible for the security of the White House, was the logical person in charge to order unauthorized visitors to leave this government building.

 We also find no fault with the trial court's instruction on general criminal intent. Criminal trespass generally requires no specific intent. If a trespass is committed under a bona fide belief of a right to enter, such may be shown in defense,[10] but here there was no claim of such right. Appellants know the visiting hours were long past; they had no appointment or invitation to justify their presence in the White House at that hour. Any suggestion that appellants had a specific intent to demonstrate or protest in the exercise of free speech would not justify their unlawful acts. What was said by Justice Fortas, concurring in Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965), is relevant here.

> Civil rights leaders, like all other persons, are subject to the law and must comply with it. Their calling carries no immunity. Their cause confers no privilege to break or disregard the law.

We have unduly prolonged this opinion only because numerous points have been earnestly pressed upon us by counsel. Actually the case is a simple one. A group of apparently intelligent people[11] deliberately violated the law, defied legal authority and invited arrest. After a fair trial they were found guilty. They seek to avoid their convictions by a series of technical arguments, none of which have substantive merit.

Affirmed.

---

10. Bowman v. United Sates, D.C.App., 212 A.2d 610 (1965); Wise v. Commonwealth, 98 Va. 837, 36 S.E. 479 (1900).

11. The only appellant who testified was a student at a local university.