Jack Kenneth LEISS, Appellant,

v.

UNITED STATES, Appellee.

No. 9734.

District of Columbia Court of Appeals.

Argued June 10, 1976.

Decided Sept. 20, 1976.

Geoffrey McC. Johnson, law student counsel appointed by the court, with whom

Michael E. Geltner, Washington, D.C., also appointed by the court, was on the brief, for appellant.

Daniel A. DeRose, Asst. U.S. Atty., Washington, D.C., with whom Earl J. Silbert, U.S. Atty., and John A. Terry and Robert M. McNamara, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FICKLING, HARRIS and MACK, Associate Judges.

HARRIS, Associate Judge:

Appellant was convicted in a jury trial of unlawful entry. D.C.Code 1973, § 22–3102. He challenges the validity of the statutory provision upon which his conviction is based, both on its face and as applied. Appellant also contends that the trial court erred in its charge to the jury concerning his "good faith" defense. We affirm.

At 10:45 a.m. on January 29, 1975, appellant, together with a codefendant who has not appealed, entered the White House grounds through the East Gate which was open to receive the public. Once inside the grounds the two men stationed themselves a short distance from the gate and began reading aloud a statement protesting United States' policy in Southeast Asia. The statement included selected provisions of the Paris Peace Accords which concerned the termination of hostilities in Vietnam. Appellant's conduct apparently was occasioned by the second anniversary of the signing of the Peace Accords, and by a belief that the American government was acting in violation thereof.

Shortly after appellant began to read his statement, he was approached by Captain Pete N. Manthos, the senior officer of the White House division of the Executive Protective Service. Appellant was asked whether it was his intention to join the tour group and whether he wanted to present a petition to, or speak with, any White House staff member. Appellant re-

plied that he wished to remain where he was and continue to read his statement. He thereupon was informed that while he would be permitted to stand and read aloud until the noon closing hour, a refusal to leave the grounds at that time would subject him to arrest. Until noon, appellant did read his statement numerous times, peacefully and without incident.

When the public visiting hours were over, Captain Manthos again approached appellant and asked him to leave the White House grounds. Appellant refused to do so. The officer read the unlawful entry statute to him, and told him that continued refusal would result in his arrest. Appellant then sat down in defiance of the officer's request. Before ordering appellant's arrest, Captain Manthos offered him still another opportunity to depart. Appellant spurned this suggestion, and was arrested.[1]

Appellant unsuccessfully sought pretrial dismissal of the information on various constitutional grounds. At trial, appellant's chief defense was that, despite the explicit order from Captain Manthos that he leave, he had a bona fide belief in his right to remain on White House property. This belief, he argued, negated the general criminal intent which is a necessary element of the offense of unlawful entry. The alleged basis for his feeling that he had a right to remain on the White House grounds was the fact that the White House, as the seat of the Executive, was the natural forum for the expression of his opposition to American foreign policy. The government contended that regardless of the asserted existence of appellant's subjective belief that he could lawfully remain, any such belief could have no reasonable basis in the face of both the conspicuously posted visiting hours and Captain

Manthos' explicit explanations to the contrary. Thus, the government contended that appellant was not entitled to any instruction on the asserted "bona fide belief" defense, because no factual predicate existed therefor. Nonetheless, the trial court did instruct the jury to find appellant not guilty should they find that he had had a bona fide belief in his right to remain on the White House grounds. The jury found appellant guilty.

Appellant claims that the unlawful entry statute violates the guarantees of both the Fifth and the First Amendments of the Constitution. He argues initially that the statute is impermissibly vague, and therefore contravenes the principles of due process, in that it fails to prescribe ascertainable standards for enforcement, thereby vesting unfettered discretion in the appropriate law enforcement officials. Appellant further contends that the statute is void for vagueness in that it fails adequately to apprise potential offenders of the precise nature of the conduct proscribed. Appellant's final constitutional claim is that the application of the unlawful entry statute, under the circumstances of this case, impermissibly infringed upon his right of expression as protected by the First Amendment. Additionally, with respect to his asserted defense of a "good faith" belief in his right to remain on the White House grounds, appellant contends that the charge to the jury was erroneous. While, as we have noted, the instructions did direct the jury's attention to the putative defense, the court also informed the jury that the unlawful entry statute was not unconstitutional, that appellant's conduct was not immunized by the First Amendment, and that lofty motivations would not excuse illegal activity. Appellant asserts that such a juxtaposition was

---

1. It was not alleged that appellant's initial entry upon the White House grounds was unlawful. Rather, he was charged under that portion of the statute which proscribes remaining on property without lawful authority after being ordered to depart by a person lawfully in charge thereof. *See* D.C.Code 1973, § 22–3102.

erroneous and effectively removed his only defense from the jury's consideration.[2] We reject appellant's arguments in all respects.

A criminal statute is void on vagueness grounds when it provides no standards by which conduct falling within its scope may be ascertained. Such a statute infringes upon due process rights by failing to provide fair warning of what is prohibited and inviting capricious and arbitrary enforcement by public officials. *See Papachristou v. Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). A statute will be declared unconstitutional "on its face" when it is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. Cincinnati, supra,* at 614, 91 S.Ct. at 1688. *See Parker v. Levy,* 417 U.S. 733, 755, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

The District of Columbia's unlawful entry statute is not vague on its face.[3] It is, by its terms, aimed at certain limited conduct which is constitutionally subject to restraint. It prohibits the act of entering or remaining upon any property when such conduct is both without legal authority and against the expressed will of the person lawfully in charge of the premises. Thus, to be subject to the statute's sanctions, one must be without legal right to trespass upon the property in question. We find no

resemblance between the instant provisions and those condemned in the cases upon which appellant relies. Under our statute, an individual's otherwise lawful presence is not conditioned upon the mere whim of a public official to whom the statutory language lends no guidance. *See Shuttlesworth v. Birmingham,* 383 U.S. 87, 90, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965). Appellant has not alleged the existence of discriminatorily selective enforcement, nor does the record intimate any such abuse. The statute encourages no greater exercise of discretion and on-the-spot administrative judgment than is constitutionally permissible. *See Grayned v. Rockford,* 408 U.S. 104, 113–14, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Cox v. Louisiana,* 379 U.S. 559, 568–69, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

Moreover, the statute is not subject to the criticism that its prohibitions are phrased in such imprecise language as to be beyond the comprehension of those seeking to conform their behavior to its mandate. The type of conduct subject to its sanctions is clearly identified in words of common understanding, with little room for misinterpretation or conjecture. With respect to this aspect of appellant's claim of vagueness, we note the Supreme Court's views as expressed in *Colton v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972):

The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both

---

2. Appellant did not object to this aspect of the court's charge at trial although trial counsel and the court discussed the instructions at length. It is beyond dispute that unchallenged instructions must constitute plain error to merit consideration for the first time on appeal. *Watts v. United States,* D.C.App., 362 A.2d 706 (1976) (en banc); *Adams v. United States,* D.C.App., 302 A.2d 232 (1973). *See* Super.Ct.Cr.R. 30.

3. D.C.Code 1973, § 22–3102, provides:
Any person who, without lawful authority, shall enter, or attempt to enter, any

public or private dwelling, building or other property, or part of such dwelling, building or other property, against the will of the lawful occupant or of the person lawfully in charge thereof, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof, shall be deemed guilty of a misdemeanor . . . . .

general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

In his effort to establish the vagueness of the unlawful entry statute, appellant raises several hypothetical situations which, he argues, demonstrate the statute's fatal imprecision. For example, he contends that because the statute fails to require explicitly that the violator be aware that the person demanding his departure is "lawfully in charge", an individual either unaware or suspicious of the asserted authority would not know if his refusal to leave would violate the law. While we view appellant's reading of the statute as strained, we conclude that regardless of any possible ambiguity of its provisions as applied to a hypothetical situation, such speculative uncertainty cannot be asserted successfully by appellant to challenge his own conviction. It is a well-settled principle that one to whose conduct a statute clearly applies is not entitled to attack it on the ground that its language might be less likely to give fair warning in some other situation not before the court. *See, e.g., Parker v. Levy, supra,* 417 U.S. at 756, 94 S.Ct. 2547; *Gooding v. Wilson,* 405 U.S. 518, 530, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (Burger, C. J., dissenting); *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). This principle is a necessary corollary of the rule that decisions of constitutional dimension are made only as specifically required by the facts of an actual controversy. *See United States v. Raines, supra.*

It is incontrovertible that appellant was aware that the statute prohibited his particular conduct. He could have had no doubt that his presence on the White House grounds past the noon closing hour would be against the will of the persons in lawful charge of the premises. That will was expressed by the sign on the gate restricting visiting hours, and by Captain Manthos' plain advice that appellant was forbidden to remain upon the premises after the closing hour. Appellant does not suggest that he did not see the sign or that he failed to understand the officer's directive. *See Bowman v. United States,* D.C.App., 212 A.2d 610, 611 (1965). Nor does he contend that he was unaware of or doubted Captain Manthos' lawful authority. *See Whittlesey v. United States,* D.C.App., 221 A.2d 86, 89 (1966). Since appellant's conduct was within the foreseeable and legitimate reach of the statute, it would be inappropriate for us to consider its possible application in remote and hypothetical circumstances.[4]

We similarly reject appellant's last constitutional challenge to his conviction. We perceive no way in which the application of the unlawful entry statute can be said to have interfered unduly with his rights of expression as secured by the First Amendment. Our fundamental regard for First Amendment liberties is not diminished by a recognition of the established principle that the government may make reasonable regulations, unrelated to the content of the message, concerning the time, place, and manner of the exercise of those liberties. *See, e.g.,*

4. In exceptional cases a court will consider the constitutionality of a statute as applied to situations not presently before it. Appellant contends that this is such a case. We think that appellant misconstrues the authority upon which he relies for that argument. It has been held that where the statute at issue regulates expression protected by the First Amendment, one to whom it is validly applied may nevertheless attack its constitutionality. *See Gooding v. Wilson,* 405 U.S. 518, 520–22, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). How-

ever, that proposition is inapplicable here. Only when the potential for improper application is such as would tend to suppress protected activity will normal rules of standing be relaxed and a statute invalidated irrespective of the conduct of the party raising the claim. The unlawful entry statute is not aimed at regulating speech (or other protected activity) and cannot fall within such an exception. The statute's potential for reaching beyond constitutional limits is insubstantial and highly speculative at most.

*Grayned v. Rockford, supra; Cox v. Louisiana, supra.*

■ Within the acknowledged power to impose neutral regulations upon activity otherwise protected by the First Amendment is a state's ability to control the manner in which the general public may use public property. As the Supreme Court has stated:

The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. * * * The United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose. [*Adderley v. Florida*, 385 U.S. 39, 47–48, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1967).]

The crucial question is whether the restrictions placed upon access to the White House and its grounds, and the utilization of the unlawful entry statute against individuals who refuse to comply with those restrictions, amount to a reasonable exercise of the government's power to regulate activity. The issue is to be resolved by balancing factors such as the nature of the particular public property, the weight of the governmental interests involved, the availability of alternative avenues of expression, and the extent to which the regulation unnecessarily interferes with First Amendment rights. We conclude that the limitations imposed upon appellant's use of the White House grounds constituted a considered and appropriate exercise of regulatory power which was wholly consistent with the First Amendment. *See Grayned v. Rockford, supra; United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed. 672 (1968).

Unrestricted access to the White House obviously is incompatible with its character and functions. The White House fulfills significant governmental, public, and private functions which make it far more than a symbol of the executive branch of government toward which individual grievances legitimately may be directed. It serves as an office complex for the President and much of his staff, requiring order and efficiency for the day-to-day performance of vital and often sensitive administrative activities; as a public museum, requiring the maintenance of the degree of safekeeping and decorum to which our national heritage is entitled; and as a home for the First Family, requiring the provision of a private refuge from the rigors of public life and an unfailing vigilance against the acts of potentially violent individuals.

Appellant argues that his presence did little to contravene these governmental interests in that his activity was passive, stationary, and easily observable. Moreover, he contends that the President was not in the White House on the day in question. We refuse to fashion a rule which would complicate further the complex and elaborate security precautions which already are necessary at the White House. The Secret Service and the Executive Protective Service should not be expected to formulate day-by-day changes in their protective procedures to accommodate all those who wish to make the White House their personal forum.

■ On the other side of the equation, we do not think that appellant's exercise of his First Amendment rights was excessively circumscribed. He was permitted full opportunity to express his purported grievances inside the White House grounds; he recited his statement no less than ten times during the period of his vigil. The record indicates that no attempt would have been made to interfere with him after the closing hour had he chosen simply to obey the order to depart and continue his protest just outside the gate, some 15 feet away. Given the alternative means available to appellant for the continued exercise of his rights, and the incidental manner in which compliance with the lawful order would have limited his protest, we perceive no in-

fringement of protected expression sufficient to countervail the government's interests in limiting appellant's activity. *See Pell v. Procunier*, 417 U.S. 817, 823–24, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). To hold otherwise would be to accept the universally discredited argument that persons petitioning or expressing themselves on public property are authorized to do so whenever and wherever they see fit. *Cf. Adderly v. Florida, supra.*

Finally, we consider appellant's assignment of error with respect to the impact of the court's charge on his "bona fide belief" defense. Appellant's argument that the unfavorable juxtaposition of the instructions concerning his purportedly bona fide belief in his right to remain and those regarding the law as to the First Amendment amounted to prejudicial error presupposes the threshold question of whether he was entitled to any instruction on his alleged defense. Since we conclude that he was not, we need not deal with this contention in depth.

■ While a bona fide belief in one's authority to enter or remain upon premises may negate criminal intent, and thereby exonerate behavior which otherwise contravenes the unlawful entry statute, there must be sufficient evidence that the belief had a reasonable basis before the issue properly may be submitted to the jury. *See Jackson v. United States*, D.C.App., 357 A.2d 409 (1976); *Smith v. United States*, D.C.App., 281 A.2d 438 (1971).

■ The asserted basis for appellant's belief in his right to remain on the White House grounds was the notion that the White House was a particularly appropriate site for his protest and interpretation of "the whole history of the United States". However, the record readily reveals that appellant was directly informed that his right to be on the White House grounds would lapse at noon, at which time he would be subject to arrest for trespass. Appellant testified that he knew he proba-

bly would be arrested if he refused to leave, and he was aware that noon was the "closing hour". He saw the gates close. The statute under which a continuation of his conduct would be prosecuted was read aloud to him. On these facts there was no basis upon which the jury could determine that there was any justification for his claim of a reasonable belief in his right to remain.

Appellant's real defense seems to be not that he was innocent of any intent to violate the law, but rather that the self-ordained sincerity and substance of his convictions placed him above the law. Whatever the source of the inspiration for appellant's intentional transgression of a valid statute, it does not immunize him from the consequences of his act. Under our system of justice, the depth or character of an individual's political beliefs can have no bearing upon either his obligation to adhere to the law or the courts' duty of impartial adjudication.

*Affirmed.*