**Keykavous HEMMATI, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 87–909.**

District of Columbia Court of Appeals.

Argued Dec. 14, 1988.
Decided Sept. 26, 1989.

Paul E. Nystrom, Jr., appointed by the court, for appellant.

Edith S. Marshall, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, were on the brief, for appellee.

Before NEWMAN, TERRY and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant Hemmati was convicted of unlawful entry, in violation of D.C.Code § 22–3102 (1989), for having refused to leave the office of a United States Senator at the direction of the Senator's administrative assistant. On appeal he offers several challenges to his arrest and conviction; we reject them all and affirm the judgment of the trial court.

I

Senator Robert C. Byrd of West Virginia has a suite of offices in the Hart Senate Office Building. On the morning of April 1, 1987, appellant Hemmati entered the front office reception area and presented himself to one of Senator Byrd's staff assistants, Carol Kiser, saying that he would like to see the Senator. He did not disclose the purpose of his visit, however, stating only that he wanted to see Senator Byrd that day in person and would not leave until he did so. Mr. Hemmati then sat down on a couch in the reception room. Kiser explained to him that the Senator was on the Senate floor and was therefore unavailable,[1] but Hemmati insisted that he would not leave the office and would wait.

Although she tried to elicit the reason for his visit, Hemmati would not engage in any dialogue. He found it "difficult ... to communicate his needs" and said only that he wanted the Senator to come back to the office, regardless of his other duties on the Senate floor. Kiser's impression was that Hemmati "had one goal in mind, and he would not accept anything less. He demanded to see Senator Byrd." Because he appeared to be "intense and determined," Kiser testified, she began to feel somewhat frightened.

The evidence also showed that in the past Mr. Hemmati had disrupted Senator Byrd's offices by pounding on desks and threatening hunger strikes. On one occasion the Senator's chief case worker had spent considerable time with Hemmati, even though he was not a citizen of West Virginia and thus was not a constituent of the Senator.[2] At the end of that interview, which lasted for more than an hour, the case worker explained to Mr. Hemmati that Senator Byrd could not help him with his perceived problems.

Faced with a person who had been disruptive in the past, knowing that the reception area was "where the center of everything is, where people come and go," and having to deal with constituents arriving and telephones ringing, Kiser sought guidance from her supervisor, Joan Drummond. As the Senator's administrative assistant, Mrs. Drummond was in charge of the day-to-day operations of the office. She was authorized in the Senator's absence to act in his behalf and to direct the activities of other staff members. After hearing Kiser's account of Hemmati's behavior, Drummond told her to call the Capitol Police.

Detective James Powell, answering the call, spoke with Mr. Hemmati for about twenty minutes in an effort to persuade him to leave, but Hemmati still refused. Kiser and Powell then went back to Mrs. Drummond for further instructions. Powell told Mrs. Drummond that, under Capitol

---

1. At that time Senator Byrd was Majority Leader of the Senate. His duties in that office required him to spend a great deal of time on the Senate floor when the Senate was in session.

2. Hemmati was a native of Iran and had lived in California for several years.

Police guidelines, the person lawfully in charge of the office had to approve any request for someone to leave; the police could not take any action until this was done. Accordingly, under the authority vested in her by Senator Byrd, Mrs. Drummond directed Carol Kiser to ask Hemmati to leave the office, and authorized Detective Powell to arrest Hemmati if he refused to comply.

Powell and Kiser then returned to the reception area, where Kiser asked Hemmati at least three times to leave. On each of these three occasions Detective Powell explained to Mr. Hemmati that he would be arrested if he refused to go. Hemmati, however, persisted in refusing to leave until he could meet with the Senator in person. Detective Powell thereupon placed him under arrest.

Hemmati testified in his own defense. His testimony revealed that he had formerly worked for the University of California at Riverside, and that he thought he had been mistreated there and unjustly "forced to leave." He said that he had sent numerous letters requesting assistance to officials of the United States government, including President Reagan and various members of Congress, and that he had appealed to the Department of Justice and the Equal Employment Opportunity Commission. He felt that he had a right to seek help from Senator Byrd because, as Majority Leader, he was "a Senator of the country," and that like every member of Congress, the Senator was "fully responsible ... for any type of corruption of any state and federal agency...." For this reason, he testified, his presence at the office of Senator Byrd "was completely legal."

## II

Under D.C.Code § 22–3102 (1989), a person may be convicted of unlawful entry on public or private property if he or she remains on that property, without lawful authority, after having been told to leave by the person lawfully in charge. When public property is involved, this court has also required the government to prove an "additional specific factor establishing the [defendant's] lack of a legal right to remain." *O'Brien v. United States*, 444 A.2d 946, 948 (D.C.1982) (citations omitted). The purpose of this requirement is to protect all citizens against "capricious and arbitrary enforcement [of the unlawful entry statute] by public officials," so that "an individual's otherwise lawful presence [on public property] is not conditioned upon the mere whim of a public official...." *Leiss v. United States*, 364 A.2d 803, 806 (D.C. 1976) (citations omitted), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977); *see Carson v. United States*, 419 A.2d 996, 998 (D.C.1980). It is, moreover, a "well-established rule that the government may regulate speech and communicative conduct on public property only in a narrow and reasonably necessary manner which serves significant government interests," and that "[a]ny regulation impinging upon such activity must be content-neutral and non-discriminatory." *Smith v. United States*, 445 A.2d 961, 964–965 (D.C.1982) (en banc) (citations omitted). Invoking these principles, Hemmati argues that his arrest and subsequent conviction violated his rights under the First Amendment to the Constitution.[3] We hold, to the contrary, that neither Hemmati nor anyone else has an unqualified constitutional right to meet with a Senator (or any other high public official) in person, at a time and place of his own choosing.[4]

---

3. Among the rights secured by the First Amendment is "the right of the people ... to petition the Government for a redress of grievances." This appears to be the principal right which appellant claims to have been infringed in this case. His brief also makes passing mention of his right to freedom of speech, however, so we shall assume that his arguments on appeal embrace both of these First Amendment rights. See also note 6, *infra*.

4. Because Hemmati never raised his First Amendment claims in the trial court, through a motion to dismiss or otherwise, he is not entitled to reversal of his conviction on First Amendment grounds unless he can demonstrate plain error. *See Eissa v. United States*, 485 A.2d 610, 611 (D.C.1984), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 544, 88 L.Ed.2d 474 (1985). We find no plain error in this case; indeed, as we shall discuss, we find no error at all.

"Nothing in the First Amendment or in [the Supreme] Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Minnesota Board for Community Colleges v. Knight,* 465 U.S. 271, 285, 104 S.Ct. 1058, 1066, 79 L.Ed.2d 299 (1984). "There must be a limit to individual argument in such matters if government is to go on." *Bi–Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915). We think the same can reasonably be said *a fortiori* about communications on private issues, such as Mr. Hemmati sought to engage in with Senator Byrd. Further, Hemmati had no right under the circumstances to remain in the Senator's office after being told by Carol Kiser, at the direction of the person lawfully in charge—the Senator's administrative assistant—to leave. It is settled law that "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Greenburgh Civic Associations,* 453 U.S. 114, 129, 101 S.Ct. 2676, 2685, 69 L.Ed.2d 517 (1981) (citations omitted). "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966); *accord, e.g., Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983); *Greenburgh, supra,* 453 U.S. at 129, 101 S.Ct. at 2685.[5] We think it is clear that Hemmati had no substantive right under the First Amendment to see Senator Byrd personally or to remain in his office after being asked to leave.[6]

Even if Hemmati's First Amendment rights were implicated in this case, we would have to conclude that his rights were not violated because the evidence clearly established the "additional specific factor" of which the cases speak. Additional specific factors have taken a variety of forms in a variety of contexts. *See, e.g., Shiel v. United States,* 515 A.2d 405, 407–408 (D.C.1986) (early closing regulation implemented in Capitol Rotunda to facilitate security for Presidential address), *cert. denied,* — U.S. ——, 108 S.Ct. 1477, 99 L.Ed.2d 706 (1988); *O'Brien v. United States, supra,* 444 A.2d at 948 (regulation prohibiting specified activities within fifteen feet of any escalator on transit authority property); *Carson v. United States, supra,* 419 A.2d at 998–999 (chain across restricted portion of White House lawn); *Leiss v. United States, supra,* 364 A.2d at 806–807 (posted visiting hours); *cf. Whittlesey v. United States,* 221 A.2d 86, 89 (D.C.1966) (posted sign stating White House visiting hours informed defendants of unlawful character of their actions).[7]

---

**5.** *See also Jeanette Rankin Brigade v. Chief of Capitol Police,* 342 F.Supp., 575, 584 (D.D.C.) (noting that the Capitol Grounds are "traditionally ... open to the public," but "*excluding* such places as the Senate and House floors, committee rooms, etc." (emphasis added)), *aff'd,* 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972); *United States v. Murphy,* 114 Daily Wash.L.Rptr. 2149, 2156 (D.C.Super.Ct. August 8, 1986) (citing *Jeanette Rankin Brigade* and distinguishing between the public character of the Capitol Rotunda and the non-public character of an "office of a member of Congress").

**6.** Appellant contends that his First Amendment right of assembly was also infringed. This contention is meritless because the right of assembly protects group activity, not the conduct of an individual. *See DeJonge v. Oregon,* 299 U.S. 353, 364, 57 S.Ct. 255, 260, 81 L.Ed. 278 (1937) (right to assemble is right of citizens to meet peaceably for a lawful purpose); *Thorne v. Jones,* 765 F.2d 1270, 1273–1274 (5th Cir.1985) (right of assembly "connotes a gathering, not a visitation"), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 1199, 89 L.Ed.2d 313 (1986).

**7.** In cases involving the White House, this court has not always required proof of an additional specific factor when there was evidence of an order to quit by someone lawfully in charge. In *Smith v. United States, supra,* a Secret Service policy forbidding any type of demonstration on the White House grounds was cited by this court, "not because ... it has any proscriptive weight, but simply to show that enforcement of the unlawful entry statute by the White House security people is *reasonable and not content oriented.*" 445 A.2d at 966 (emphasis added). The court went on to say that "it would have been easier for any of us to decide this case" if

The additional specific factor in this case, if it presented a genuine First Amendment issue (which it does not), would be the established policy in Senator Byrd's office—and apparently throughout the Senate—which Mrs. Drummond identified as the "rule of congressional courtesy." Under this policy, appointments would generally be made for Senator Byrd's West Virginia constituents, but citizens from other states were referred as a matter of course to their own Senators. According to Mrs. Drummond's uncontradicted testimony:

Now, people who come in the office who are not West Virginians, who are not constituents, operate under an informal but very closely followed policy called the rule of congressional courtesy, where we expect to take care of the Senator's constituents from West Virginia and other Senators from other states are expected to take care of the problems of their constituents.

So, in almost every situation, if a non–[West Virginian] comes in the office and says he wants to see Senator Byrd, it's pointed out to him that he's not a constituent, that he should go see the Senator from his state. And if that person then refuses and wants to stay, then that—

then ... the kind of situation that we had [with Mr. Hemmati] would occur.

Thus, even if we thought that an additional specific factor had to be proved in this case, that factor existed in Senator Byrd's policy of routinely referring other Senators' constituents to them, and almost always refusing to see such persons himself. This is a content-neutral policy, unrelated to the exercise of First Amendment rights, and narrowly tailored to further a significant governmental interest: that Senator Byrd's office be able to serve *his* constituents fully and effectively. This policy, communicated to Mr. Hemmati, put him on notice that he had no right to insist on seeing Senator Byrd or to remain in the office until the Senator spoke with him.[8]

This court, since the earliest challenges to the unlawful entry statute, has consistently held that the statute may be properly and constitutionally invoked to protect "the orderly processes of the Congress, or ... the safety of individual legislators, *staff members*, visitors, or tourists, *or their right to be free from intimidation, undue pressure, noise or inconvenience.*" *United States v. Nicholson*, 97 Daily Wash.L. Rptr. 1213, 1218–1219 (D.C.Ct.Gen.Sess. July 17, 1969) (emphasis added), *aff'd and quoted with approval*, 263 A.2d 56, 57

there had been some regulation or public notice proscribing the defendants' specific conduct. *Id.* Because of the "unique nature" of the White House and its grounds, however, the court ruled that a blanket prohibition of any form of demonstration within the grounds was permissible—in other words, that an additional specific factor need not always be proved in White House cases—noting, nevertheless, that the appellants' First Amendment argument "might well be persuasive if we were dealing with almost any other form of public property." *Id.* at 965.

The government urges us to hold likewise here, but we decline to do so. *Smith* is one of a series of cases, dating back more than twenty years to *Whittlesey, supra,* in which we have repeatedly declared that the White House is unique. Although there is much sound law to be found in these opinions, it is clear from all of them that the exercise of First Amendment rights within the White House complex may be regulated in a "more stringent [manner] ... than would be tolerated on most other government properties." *Smith v. United States, supra,* 445 A.2d at 965; *accord, Leiss v. United States,*

*supra,* 364 A.2d at 808. We will continue to rely on these cases in other respects, both in this opinion and elsewhere, but we cannot ignore the requirement of an additional specific factor in non-White House cases. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

8. Detective Powell's testimony also showed that the purpose of the additional specific factor—to guard against arbitrary and capricious exercises of discretion by public officials, especially police officers—was otherwise met in this case, at least with respect to the Capitol Police. Powell made clear that he exercised little or no discretion in effecting Hemmati's arrest, following Capitol Police policy to make an arrest only on the instruction of the person in charge of a Senator's office. Given the limited discretion available to Detective Powell, this case is easily distinguishable from those on which Hemmati relies, such as *Shuttlesworth v. City of Birmingham,* 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965), and *Papachristou v. City of Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), in which statutes were so broad and vague as to give police officers virtually unlimited discretion.

(D.C.1970).[9] Senators' offices, unlike streets and parks, are neither operated as nor intended to be conduits for unrestricted expressive activity. Unlike the Capitol Rotunda or grounds, but much like the White House, Senate offices "requir[e] order and efficiency for the day-to-day performance of vital and often sensitive administrative activities...." *Leiss v. United States, supra,* 364 A.2d at 808; see note 5, *supra.* To preserve the character and usefulness of this species of public property, we deem it essential to enable a United States Senator, through delegation of authority to his or her staff, to invoke the unlawful entry statute when circumstances warrant.

The evidence showed that Mr. Hemmati had disrupted Senator Byrd's offices on "several" prior occasions by "pound[ing] on people's desks and threatening hunger strikes...." His obstreperous conduct violated the right of Senator Byrd's "staff members ... to be free from intimidation, undue pressure, noise, or inconvenience." *United States v. Nicholson, supra,* 263 A.2d at 57. We also note that Hemmati was not arrested for the content of his speech, but because of his conduct. Hemmati refused to communicate his message to the staff on the day he was arrested, demanding only to see Senator Byrd personally.[10] As we have said, he had no substantive right to have this demand met. It is equally clear that Hemmati had adequate notice that his conduct was prohibited and that he would be subject to criminal sanctions. We find no First Amendment violation.

## III

■ Hemmati's next contention is that the jury was improperly instructed on the offense of unlawful entry and that the jury instructions violated his right to equal protection of the laws. The trial court gave the standard instruction on unlawful entry,[11] to which defense counsel did not object. Included in the instruction was the following language:

Evidence has been introduced that the defendant believed he had a right to remain present in the area in question. One who remains present in a restricted area with a bona fide belief of his legal authority to remain there is not guilty of unlawful entry. Thus, you cannot find the defendant guilty of unlawful entry unless you are convinced beyond a reasonable doubt that he did not have a good faith in his legal authority to remain in the area after being directed to leave.[12]

When the jury sent a note asking the court to "review" this instruction for them, the court simply reread the language we have quoted.

Later, however, the jurors reported that they were deadlocked and asked to be dismissed, or in the alternative for further instructions. The court then read the standard instruction *in toto* again, but clarified for the jurors, one of whom asked for an explanation in "laymen's terms," the meaning of the "bona fide belief" portion of the instruction. The court explained:

Now, evidence was introduced in this case that the defendant believed he had a

**9.** The opinion of the trial court in *Nicholson* is printed as an appendix to *Dellums v. Powell,* 184 U.S.App.D.C. 275, 305, 566 F.2d 167, 197 (1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978).

**10.** The Supreme Court has made clear that "[i]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive." *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984). Hemmati never communicated any message other than (1) that he wanted

to see Senator Byrd, and (2) that he would go on a hunger strike if this demand went unmet. He was not arrested because of these messages, but because of his refusal to leave an office where he had no right to be.

**11.** Criminal Jury Instructions for the District of Columbia, No. 4.44(B) (3d ed.1978).

**12.** This language appears in brackets as the last paragraph of the standard instruction. The comment following the instruction states that "the bracketed language ... [should] be given where evidence is introduced that the defendant entered or remained on premises with a bona fide belief of his right to be there...."

right to remain present in the area in question.

One who remains present in a restricted area with a bona fide belief of his legal authority to remain there is not guilty of unlawful entry.

*Bona fide belief, otherwise known as a good faith belief, is defined as a belief for which there is a reasonable basis.* Thus you cannot find the defendant guilty of unlawful entry unless you are convinced beyond a reasonable doubt that he did not have a good faith belief, that is, *a belief with a reasonable basis,* in his legal authority to remain in the area after being directed to leave.

Now, with that instruction, ladies and gentlemen, I hope that clarifies what may have been a somewhat murky area for you. And I hope with that instruction you can reach a verdict. [Emphasis added.]

Defense counsel did not object to this instruction, proposing only that a bona fide belief be defined as one for which there is a "reasonable and sincere basis." Hemmati now contends, however, that the trial judge's definition of a bona fide belief "as a belief for which there is a reasonable basis" was error.

Hemmati's position is in direct conflict with this court's precedents. This court has repeatedly held, as the trial court in this case instructed the jury, that "[a] bona fide belief must have some reasonable basis before an accused can claim that such a belief exonerates his behavior." *Jackson v. United States,* 357 A.2d 409, 411 (D.C. 1976) (citation omitted), quoted with approval in *Gaetano v. United States,* 406 A.2d 1291, 1293 (D.C.1979). We have also emphasized that "[a] bona fide belief must

have some justification—some reasonable basis." *Smith v. United States,* 281 A.2d 438, 439 (D.C.1971), quoted with approval in *Gaetano, supra,* 406 A.2d at 1293. That is precisely how the trial court defined bona fide belief for the jurors. It is no defense to a charge of unlawful entry, as Hemmati erroneously maintains, that the crime was committed out of a sincere personal or political belief, however genuine, in the rightness of one's actions. *United States v. Dougherty,* 154 U.S.App.D.C. 76, 100–101 & n. 54, 473 F.2d 1113, 1137–1138 & n. 54 (1972); *see Arshack v. United States,* 321 A.2d 845, 852–853 (D.C.1974) (acts of conscience, civil disobedience, and proclaimed allegiance to higher law are not acceptable defenses). In light of these and similar precedents, the trial court's instruction on good faith belief was entirely proper.[13]

## IV

■ Before the trial began, defense counsel sought to subpoena Senator Byrd, asserting that the Senator "might be in a position to provide information with respect to—to what extent Mr. Hemmati has a right to access to his office." When questioned by the court, however, counsel admitted that Senator Byrd had "no direct involvement" in the case or in the events leading to Mr. Hemmati's arrest. The court ruled that the relevance of Senator Byrd's testimony had not been sufficiently shown and refused to enforce the subpoena. This ruling was correct for at least two reasons.

■ First, there was no showing or proffer by the defense, either before or during

---

13. Hemmati also contends that because the court expanded upon the standard jury instruction in his case, he was somehow denied his right to equal protection of the laws. To prevail on this claim, however, Hemmati must demonstrate at a minimum that he has been treated differently from those charged with the same crime *and* that the difference in treatment lacks a rational justification. *See, e.g., Washington v. United States,* 130 U.S.App.D.C. 374, 382, 401 F.2d 915, 922 (1968). There is nothing in the

record of this case to suggest that Hemmati was treated differently from similarly charged defendants. On the contrary, because the instruction in this case was in accordance with well-settled law, it is clear that Hemmati was treated in the same manner as other defendants in other cases. Furthermore, the variation in the instruction clearly had a rational purpose, *viz.,* to alleviate the jurors' confusion and to ensure that their verdict would be based on a proper understanding of the law.

trial, that the Senator had any direct knowledge of the facts of the case or that his testimony was otherwise relevant or essential to a fair trial. *See Whittlesey v. United States, supra,* 221 A.2d at 90; *cf. United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982) (defendant claiming denial of right to compulsory process "must at least make some plausible showing of how [the witnesses'] testimony would have been both material and favorable to his defense" (footnote omitted)). Second, there is nothing in the record to suggest that Senator Byrd could have amplified or contradicted .in any respect the testimony of his employees, Carol Kiser and Joan Drummond. Consequently, his testimony would have been needlessly repetitious, and a waste of a high public official's time in contravention of public policy. *See Davis v. United States,* 390 A.2d 976, 980–981 (D.C.1978); *Overholser v. De Marcos,* 80 U.S.App.D.C. 91, 94, 149 F.2d 23, 26, *cert. denied,* 325 U.S. 889, 65 S.Ct. 1579, 89 L.Ed. 2002 (1945).[14]

*Affirmed.*

---

**14.** We also reject, as totally without merit, Hemmati's challenge to the sufficiency of the evidence. Viewed in the light most favorable to the government, *e.g., Byrd v. United States,* 388 A.2d 1225, 1229 (D.C.1978), the evidence was plainly sufficient to prove that Mr. Hemmati was guilty of unlawful entry.

Hemmati's principal argument is that although the evidence may have showed that his presence was against the will of Carol Kiser, it did not show that it was against the will of Joan Drummond, as the information alleged, nor did it prove that Kiser had the authority to ask him to leave. This court has held, however, that more than one person may be lawfully in charge of designated premises. *Whittlesey v. United States, supra,* 221 A.2d at 91. We have also recognized that the person in charge may act through an agent in ordering someone to leave. *Grogan v. United States,* 435 A.2d 1069, 1071 (D.C.1981). The evidence in this case was sufficient to permit a finding that Joan Drummond was in charge of the office and that she exercised her authority through her agent, Carol Kiser.