Gregory I. BOERTJE, Appellant,

v.

UNITED STATES, Appellee.

No. 85–1408.

District of Columbia Court of Appeals.

Argued Feb. 16, 1989.
Decided Oct. 31, 1989.

Nina Kraut, Washington, D.C., appointed by this court, for appellant.

Kathleen A. Brandon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Mary Ellen Abrecht, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before BELSON and TERRY, Associate Judges, and MACK, Associate Judge, Retired.*

TERRY, Associate Judge:

Appellant was convicted of unlawful entry[1] for having refused to leave the White House grounds when directed to do so by a person in lawful authority. On appeal he argues that he was engaging in symbolic speech at the White House and that the government failed to prove an additional specific factor establishing his lack of a legal right to remain there. He also contends that the trial court denied him the right to make an opening statement and to present an effective defense, and that the court erred in refusing to ask certain questions of the venire during the *voir dire*.

---

* Judge Mack was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on October 1, 1989.

1. D.C.Code § 22–3102 (1989).

Appellant's first argument is unsupported by the evidence. His *voir dire* argument, although it has some merit with respect to one question, does not warrant reversal. His other contentions are totally without merit and are, in any event, affirmatively refuted by the record.

I

On December 29, 1984, the day after the feast of the Holy Innocents,[2] appellant Boertje and a companion, along with a group of tourists, entered the grounds of the White House through the visitors' center on East Executive Avenue. As appellant entered the visitors' center, he walked past a posted sign containing this message:

The White House and grounds are protected by the United States Secret Service and the United States Secret Service Uniform Division, pursuant to 18 U.S. Code 3056 and 3 U.S. Code 22. To assure your enjoyment of your tour and to assist in the protection of the properties, all persons entering this property are advised that any activity that disrupts the tour or impedes the flow of pedestrian traffic is prohibited. Thank you for your cooperation, and please enjoy your visit to the White House.

To ensure an orderly flow of pedestrian traffic through the White House grounds, the paved tour route is bordered along its entire length by a line of metal stanchions connected by metal chains. Tour guides are also stationed along the route to remind visitors that they must keep the line moving.

Sergeant Roland Mayclin of the Secret Service was the senior uniformed officer on duty that morning on the north grounds of the White House. As such, he had the authority to ask any person who was disrupting a tour or impeding pedestrian traffic to leave the grounds. Thus, when Mayclin saw Boertje and his companion stop along the tour route, he asked them to keep pace with the normal flow of pedestrian traffic. Boertje replied, "I'm not going to leave. You'll have to arrest me." As he spoke these words, Boertje knelt down on the paved walkway. Sergeant Mayclin repeated his request, this time telling Boertje that he would be subject to arrest for unlawful entry if he refused to get up and leave. Boertje did not respond. Mayclin made the same request of Boertje's companion, who thereupon walked out the gate "in the normal manner." Boertje, however, remained kneeling and gave no response when Mayclin asked him for the third time to get up and move along. Consequently, on the orders of Sergeant Mayclin, Boertje was arrested by Secret Service Officer Michael Redwine, who had walked over to assist Mayclin.

At trial Boertje did not refute the government's version of the facts as they were recounted by Mayclin and Redwine. He admitted seeing the posted warning sign at the visitors' center, admitted entering the White House grounds "with the intent of risking arrest," admitted being asked several times by Sergeant Mayclin to get up off his knees and move along the tour line or risk arrest, and admitted refusing to do so. He defended his actions by telling the court that he was acting on his belief that the "first strike" nuclear capability of the United States was contrary to the teachings of God and an international crime against peace as defined by the Nürnberg tribunal.[3] According to Boertje, he chose the White House grounds for his protest because in his view the President was primarily responsible for this country's nuclear weapons policy.

In anticipation of his defense, Boertje,

---

**2.** Fearing that the newborn infant Jesus would take his throne away from him, King Herod calculated the time of Jesus' birth from information given to him by the Magi. He then ordered the massacre of all male children in Bethlehem and the surrounding region who were two years old and under. *See Matthew* 2:7–8, 16–18. The slaughtered children came to be known as the Holy Innocents, and their feast day is generally celebrated on December 28.

**3.** Boertje testified that he was a member of Jonah House, a Baltimore-based community

who served as his own attorney at trial,[4] proposed a lengthy set of *voir dire* questions, all but two of which the trial court rejected as irrelevant. Boertje claims that the trial court erred in refusing to ask the remaining two *voir dire* questions in the form requested. Additionally, he argues that the unlawful entry statute as applied to him violated his free speech rights under the First Amendment, and that he was denied an opportunity to make an opening statement and to put on the defense he wanted.[5]

## II

■ The White House differs from all other properties owned by the United States government because it is the official residence of the President. Because of its unique nature, the exercise of citizens' First Amendment right of free speech on the White House grounds may be regulated in a "more stringent [manner] ... than would be tolerated on most other government properties." *Smith v. United States*, 445 A.2d 961, 965 (D.C.1982) (en banc); *accord, Leiss v. United States*, 364 A.2d 803, 808 (D.C.1976), *cert. denied*, 430 U.S. 970, 97 S.Ct. 1654, 52 L.Ed.2d 362 (1977). Of course, any restriction on the exercise of First Amendment rights, at the White House or elsewhere, must be content-neutral, non-discriminatory, and no broader than "reasonably necessary ... [to serve] significant government interests." *Smith v. United States, supra*, 445 A.2d at 964–965 (citing cases). Boertje contends that by kneeling down on the tourist path he was engaging in symbolic speech, and that it was unreasonable for the Secret Service officers to arrest him rather than to permit him to stay on the grounds at least until visiting hours were over, as was done in *Leiss v. United States, supra*. We reject his argument because there are significant

"dedicated to full-time resistance against nuclear weapons."

4. Although Boertje proceeded *pro se*, the court nevertheless permitted an attorney to assist him, during both the pre-trial proceedings and the trial itself. That attorney now represents him on appeal.

factual differences between *Leiss* and this case.

In *Leiss* two protesters entered the White House grounds with a tour group, stationed themselves near the entrance gate, and began to read a statement in opposition to United States foreign policy. They were told by an Executive Protective Service officer that they could stand there and continue to read their statement until the noon closing hour, but that if they remained on the grounds after that time, they would be subject to arrest. When the visiting hours were over and the gates were about to be closed, Leiss refused to leave and was arrested.

Here, on the other hand, Boertje simply knelt down without saying a word. When Sergeant Mayclin asked him to get up and proceed along the tour route, all that Boertje said was "I'm not going to leave. You'll have to arrest me." These were the only words he spoke before he was arrested. Even though Mayclin asked him twice more to get up and move along and told him that he would be subject to arrest for unlawful entry if he refused to do so, Boertje said nothing further. According to the evidence, Boertje never told Sergeant Mayclin, Officer Redwine, or anyone else at the White House that he was protesting against United States nuclear weapons policy. Unlike the officers in *Leiss*, who were informed of the protesters' intentions, Sergeant Mayclin and Officer Redwine had no way of knowing what Boertje's intentions were or what his message was.

■ The Supreme Court has made it quite clear that a person cannot claim the protection of the First Amendment without engaging or attempting to engage in some kind of communication, either by speech or by conduct. "[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the

5. He also argues that the trial court erred in denying his motion for judgment of acquittal. This argument is patently without merit. *See, e.g., McEachin v. United States*, 432 A.2d 1212, 1217–1218 (D.C.1981).

First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive." *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069 n. 5, 82 L.Ed.2d 221 (1984). We are unpersuaded by Boertje's argument that the mere act of kneeling, without more, is symbolic speech protected by the First Amendment. When compared with acts found to have a communicative element, there was no reasonable likelihood that Boertje's act conveyed to those who saw it any message at all, let alone a message that he was expressing his dissatisfaction with United States nuclear weapons policy. *Compare Spence v. Washington,* 418 U.S. 405, 410–411, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974) (display of an American flag bearing a peace symbol and hung upside down during a time of political turmoil); *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing of black armbands to protest continuing American involvement in Vietnam); *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (burning a draft card on the courthouse steps at a time when hostilities in Vietnam were escalating).[6]

■ Sergeant Mayclin had no way of knowing why Boertje suddenly fell to his knees in front of the White House. Since Boertje's conduct failed to "convey a particularized message," *Spence v. Washington, supra,* 418 U.S. at 411, 94 S.Ct. at 2730, it necessarily follows that his arrest

could not have been content-based[7] and that his First Amendment rights were not violated. Given the complex security problems involved in protecting the President and his residence, we cannot find fault with the police response to Boertje's uncommunicative conduct. *See Smith v. United States, supra,* 445 A.2d at 966–967.

■ Along these same lines, Boertje argues that the government failed to prove an "additional specific factor establishing [his] lack of a legal right to remain [on the White House grounds]." *O'Brien v. United States,* 444 A.2d 946, 948 (D.C.1982) (citations omitted). The requirement of an "additional specific factor" has been developed by this court to guard against the infringement of First Amendment rights by government officials seeking to eject citizens from public property in reliance on the unlawful entry statute. *See Wheelock v. United States,* 552 A.2d 503, 505 (D.C. 1988); *Carson v. United States,* 419 A.2d 996, 998 (D.C.1980). In this case, because the officers had no way of knowing why Boertje knelt down on the tour path and refused to leave when asked three times to do so, there was no evidence that he was exercising his First Amendment rights, and there was no need to prove an "additional specific factor." But even assuming that there was such a need, we would have to hold that the requirement was met by the posted sign at the visitors' entrance stating that "any activity that disrupts the tour or impedes the flow of pedestrian traffic is

---

**6.** Only a few months ago the Supreme Court had occasion once again to consider the issue of conduct as protected speech. While recognizing that the protection of the First Amendment "does not end at the spoken or written word," the Court also reiterated the test for determining when conduct may be entitled to such protection:

In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson,* — U.S. —, 109 S.Ct. 2533, 2539, 105 L.Ed.2d 342 (1989), quoting *Spence v.*

*Washington, supra,* 418 U.S. at 409, 94 S.Ct. at 2729. In our view, Boertje's conduct clearly fails both parts of this test.

**7.** In his opening statement, Boertje said that he had participated in a "Peace yes, arms no" march around the White House earlier that day, and that just before he knelt down, he unfurled a banner with those words on it. An opening statement, however, is not evidence. *See Robinson v. United States,* 361 A.2d 199, 200 (D.C. 1976). Notwithstanding Boertje's opening statement, no evidence was presented at trial, either by him or by the government, showing that there was a march, a banner, or any other words or actions that might have alerted the officers to the purpose behind Boertje's kneeling down.

prohibited." [8] The evidence showed that Boertje's continued presence on the well-trod tourist path potentially, if not actually, threatened to interfere with the important governmental interest of maintaining a free flow of pedestrian traffic at the White House. *See Abney v. United States*, 451 A.2d 78, 83–84 (D.C.1982); *Carson v. United States, supra*, 419 A.2d at 998. The posted sign promoted that interest and established Boertje's lack of a legal right to kneel where he knelt and to remain there for an indefinite period of time. *Id.; see Whittlesey v. United States*, 221 A.2d 86, 89 (D.C.1966).

For these reasons we find no merit in any of Boertje's First Amendment arguments.

### III

Just before the trial began, before the *voir dire* of the jury, the court ruled that Boertje could not raise the defenses of "justifiable presence" or obedience to international law. Boertje asserts that this ruling denied him the opportunity to put on the defense he wanted, including expert testimony (although he does not identify any expert or state what his or her testimony would have been). He also says that the court's ruling discouraged him from making an opening statement. The record plainly shows, however, not only that Boertje made an opening statement but that it was quite a detailed one, extending over five pages of transcript. The record also shows that Boertje, over the government's repeated objections, was given wide latitude in presenting his defense.

First, he was allowed to explain why he chose the White House for the site of his kneel-in. Then, when the government objected to a line of questioning about Boertje's opposition to nuclear weapons, the court overruled the objection (acknowledging nevertheless that it was appropriate) and allowed Boertje to tell the jury why he felt he was justified in kneeling on the White House grounds. When Boertje began to discuss international law and the Nürnberg trials, the government once again objected, but the court allowed him to explain why he felt he was obligated by international law to protest the "crime" of nuclear weapons proliferation. When Boertje started talking about the religious underpinnings of his action, the government objected again, but the court permitted him to finish his testimony. Finally, when Boertje was asked at the end of his direct examination if he wanted to say anything more, he paused and said, "That's it." This statement strongly suggests that he said all he wanted to say in his defense. On this record we find no substance in Boertje's contention that the court precluded him from presenting the defense he wanted to present.

■ In any event, a claim by Boertje that he was justified under either international or divine law to remain kneeling on the White House grounds would not have been, on the facts of this case, a valid defense to the charge of unlawful entry. *See Shiel v. United States*, 515 A.2d 405, 409 (D.C.1986), *cert. denied*, 485 U.S. 1010, 108 S.Ct. 1477, 99 L.Ed.2d 706 (1988); *Morgan v. District of Columbia*, 476 A.2d 1128, 1133 (D.C.1984); *Gaetano v. United States*, 406 A.2d 1291 (D.C.1979); *Leiss v. United States, supra*, 364 A.2d at 809. Courts have held that the defense Boertje wanted to present is not available to those who protest against nuclear power or nuclear weapons by trespassing on the property of facilities that produce nuclear power or weapons. *See, e.g., United States v. Montgomery*, 772 F.2d 733 (11th Cir.1985); *United States v. Seward*, 687 F.2d 1270 (10th Cir.1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 789, 74 L.Ed.2d 995 (1983); *United States v. Best*, 476 F.Supp. 34, 42–49 (D.Colo.1979). The fact that the trial judge eventually allowed such a defense to be made does not mean that he realized his earlier ruling was wrong. Rather, it indicates to us that the judge was bending over backwards to give Boertje as much latitude

---

8. An additional specific factor, under *O'Brien* and other cases, "may consist of posted regulations, signs or fences and barricades regulating the public's use of government property, or other reasonable restrictions." *Carson, supra,* 419 A.2d at 998.

as he reasonably could in defending himself without turning the courtroom into a political forum, which would have been inappropriate.

## IV

■ At the beginning of the *voir dire*, Boertje presented to the court a host of questions for the prospective jurors. The court refused to ask most of the proposed questions on the ground of irrelevancy, and we find no abuse of discretion in its doing so.[9] We are somewhat troubled by the court's decision not to ask one particular question, *viz.*, whether a family member or close friend of any of the potential jurors worked either for a government agency that handles nuclear materials, such as the Department of Defense or the Department of Energy, or for a company that manufactures or designs nuclear weapons or nuclear weapon systems. We hold nevertheless that the court's failure to ask this question was not an abuse of discretion.

When Boertje first proposed this question, the court was inclined to ask it, apparently in the form suggested by Boertje. Eventually, however, the court asked a more general question, namely, whether any of the prospective jurors or their relatives or close friends had "any strong feelings, either for or against a person who has participated in one or more political or religious protests ... [or] about someone who might be considered to be a political activist or a religious activist." One person responded. After the *voir dire* was completed, each party was given an opportunity to strike any prospective juror for cause. Boertje struck no one for cause. Both parties then exercised their peremptory challenges, and a jury was empaneled.

■ *Voir dire* serves to assure an accused, as far as possible, an impartial jury by exposing any juror biases that might affect the verdict. *See Jenkins v. United States*, 541 A.2d 1269, 1272 (D.C.1988). How such biases will be uncovered during *voir dire* is left to the trial court's broad discretion, and its rulings will be affirmed on appeal unless the record reveals an abuse of discretion coupled with substantial prejudice to the defendant. *See, e.g., id.* at 1272; *Musgrove v. United States*, 441 A.2d 980, 983 (D.C.1982); *Khaalis v. United States*, 408 A.2d 313, 335 (D.C. 1979); *cert. denied*, 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980). In the case at bar, we think the trial judge's initial reaction to the question was probably correct; he should have asked the potential jurors whether any of their relatives or close friends worked in the nuclear industry, especially for the military or the government. We conclude nevertheless that Boertje was not substantially prejudiced by the judge's decision to reformulate the question into one about protesters in general.[10]

9. For example, Boertje wanted the court to ask whether any member of the venire (1) was familiar with the significance of the feast of the Holy Innocents (see note 2, *supra*); (2) was aware that international law, as determined in the Nürnberg trials in post-Nazi Germany, outlawed certain kinds of warfare; (3) knew that the First Amendment prohibited the federal government from establishing any religion; (4) had heard of a West German group calling itself "Judges and Prosecutors for Peace"; (5) knew of the events in Nazi Germany that had culminated in the mass murder of millions of Jews; (6) had heard that Christian principles were inconsistent with nuclear proliferation; (7) had heard of the belief that one cannot worship both God and the bomb; (8) was aware that there were, on the average, seven false nuclear alarms per day; or (9) was familiar with the theory of a nuclear winter. Boertje also requested several biblically-based questions.

After the trial court repeatedly rejected his requests, Boertje proposed the following *voir dire* question: "Is anyone here familiar with Jesus' parable of the persistent widow and the unjust judge?" *See Luke* 18:1–5. The court ruled this question irrelevant as well.

10. We note in any event that Boertje's claim of prejudice is unparticularized and speculative. He has made no showing that any juror had friends or relatives employed in the nuclear industry. *Cf. Jones v. United States*, 386 A.2d 308, 316 (D.C.1978), *cert. denied*, 444 U.S. 925, 100 S.Ct. 263, 62 L.Ed.2d 181 (1979); *United States v. Cockerham*, 155 U.S.App.D.C. 97, 99, 476 F.2d 542, 544 (1973). At least one court has held that even when members of a jury had ties to either the military or defense contractors, such ties were too remote to establish bias toward those who were prosecuted for breaking the law in protest against the nuclear arms race. *Commonwealth v. Berrigan*, 369 Pa.Super. 145, 158, 535 A.2d 91, 98 (1987).

Just because a particular issue in a trial might conceivably prejudice some venire members against a defendant, the defendant does not always have a right to *voir dire* questions specifically directed to that issue. *See Ristaino v. Ross*, 424 U.S. 589, 594, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976). Moreover, if a court decides to ask a *voir dire* question suggested by a defendant, it is not obliged to ask the question exactly as proposed; instead, the court may alter the wording and make it more general. In this case it would probably have been the wiser course to explore more thoroughly the possibility of juror prejudice by including a question along the lines suggested by Boertje. Nevertheless, we are satisfied that the question ultimately asked by the court sufficiently probed the prospective jurors' ability to be impartial. *See, e.g., Rosales–Lopez v. United States*, 451 U.S. 182, 188–193, 101 S.Ct. 1629, 1634–36, 68 L.Ed.2d 22 (1981) (plurality opinion) (not error to ask venire members about prejudice against aliens generally, rather than prejudice against Mexicans specifically);[11] *Ristaino v. Ross, supra*, 424 U.S. at 594–598, 96 S.Ct. at 1022 (not error to inquire generally about prejudice, rather than specifically about racial prejudice); *Hamling v. United States*, 418 U.S. 87, 138–140, 94 S.Ct. 2887, 2917–18, 41 L.Ed.2d 590 (1974) (no abuse of discretion in trial court's refusal to ask specific questions about educational, political, and religious biases); *Musgrove v. United States, supra*, 441 A.2d at 983 ("while appellant's specific questions were not posed during voir dire, the jurors' feelings about police misconduct were explored to some extent"); *Jacobs v. Redman*, 616 F.2d 1251, 1257 (3d Cir.) (failure to ask specifically whether venire members knew victims of crime was not abuse of discretion, since other questions were "sufficient to elicit information sought by defendant"), *cert. denied*, 446 U.S. 944, 100 S.Ct. 2170, 64 L.Ed.2d 799 (1980). The fact that Boertje considered himself to be a protester against nuclear armaments did not automatically entitle him to specific *voir dire* questions to probe the prospective jurors' views on that subject. *See State v. Weitzman*, 121 N.H. 83, 87, 427 A.2d 3, 6 (1981).

Even assuming that some of the prospective jurors had relatives or friends whose employment was in some way connected with the manufacture or development of nuclear weapons, Boertje's entitlement to a specific *voir dire* question would depend on whether testimony on American nuclear policy impacted on the trial as a whole, *see Jenkins v. United States, supra*, 541 A.2d at 1274, or, put another way, whether Boertje's views on nuclear proliferation were "inextricably bound up with the conduct of [his] trial." *Ristaino v. Ross, supra*, 424 U.S. at 597, 96 S.Ct. at 1021; *accord, Cordero v. United States*, 456 A.2d 837, 842 (D.C.1983); *cf. Connors v. United States*, 158 U.S. 408, 15 S.Ct. 951, 39 L.Ed. 1033 (1895) (*voir dire* is designed to uncover juror bias only on the issues to be tried, not to explore the jurors' political beliefs). Boertje's views on nuclear proliferation had no impact whatever on the case as a whole, nor were his views inextricably bound up with the conduct of his trial. His beliefs about nuclear war were irrelevant to the charge of unlawful entry for the same reason that the asserted abridgment of his First Amendment rights was irrelevant: he never told anyone in authority at the White House why he was obstructing the tourist path and refusing to move.

This case is easily distinguishable from *Cordero v. United States, supra*, on which Boertje places great reliance. Cordero was arrested when, from the gallery of the United States Senate, he shouted slogans in opposition to American foreign and domestic policy. In addition to verbalizing his disenchantment with capitalist oppression, Cordero flung leaflets into the air which contained the same basic message as his oral pronouncements. Two Capitol Police officers heard him shouting and saw the leaflets. At his trial Cordero planned to

11. Two concurring justices in *Rosales–Lopez* would have gone further than the plurality and "would [have left] somewhat more to the trial court's discretion ... the decision as to whether or not [such] questions ... should be asked on *voir dire.*" *Rosales–Lopez, supra*, 451 U.S. at 195, 101 S.Ct. at 1637.

defend on the ground that he was a member of the Vietnam Veterans Against the War and the Revolutionary Communist Party and was exercising his First Amendment right to express his political views. This court held that Cordero's political beliefs and affiliations were "among the basic facts underlying his alleged offense; they would be evident to the jury as soon as the jury learned (as inevitably it would from the government's case-in-chief) *what he said* in his protest statement and had the opportunity *to examine the leaflet.*" 456 A.2d at 844 (emphasis added and footnote omitted). Cordero's conviction was reversed because the trial court failed to conduct a more detailed *voir dire.*[12]

At Boertje's trial, on the other hand, the government introduced no evidence relating to Boertje's views on nuclear weapons. Nor was it obliged to do so, since Boertje had failed to tell the two Secret Service officers why he was kneeling in front of the White House, and there was no evidence of any literature being distributed to show why he was there. In short, Boertje's religious and political views were totally irrelevant to the government's case. In light of the uncontroverted evidence that Boertje gave the officers no reason for his unusual behavior—behavior that could be characterized as threatening, or at least suspicious, under the circumstances—all the government had to do was to prove that Boertje did not leave the grounds when asked. Unlike the situation in *Cordero*, the reason behind Boertje's action was known only to Boertje at the time he was arrested. His purpose for doing what he did was therefore not "inextricably bound up with" his trial,[13] *Ristaino v. Ross, supra*, 424 U.S. at 597, 96 S.Ct. at 1021, and the trial court did not abuse its discretion when it elected to ask the venire only a general question about protesters, rather than a specific question about employment in the nuclear industry.

The judgment of conviction is accordingly

*Affirmed.*

---

12. Among the questions which Cordero sought to ask were:

Have you read or heard anything about other protest activities of the Vietnam Veterans Against the War [or] the Revolutionary Communist Party[?] If so, would anything you have heard or read come into play in your consideration of this case? ...

Have any of you or any close friends, family members, or associates ever been a member of any organization which had as one of its objectives opposition to Communism?

*Cordero, supra*, 456 A.2d at 843–844. We held that the trial court should have incorporated the substance of these questions into its *voir dire.*

13. For this reason we need not decide whether the nuclear weapons policy of the United States is a matter about which "either the local community or the population at large is commonly known to harbor strong feelings." *Cordero v. United States, supra*, 456 A.2d at 842 (citation omitted).