Jyothsna **MODY**, Appellant,

v.

**CENTER FOR WOMEN'S HEALTH, P.C. and Anita Sikand, M.D., Appellees.**

No. 08–CV–1535.

District of Columbia Court of Appeals.

Argued March 22, 2010.

Decided July 15, 2010.

Catherine D. Bertram, with whom Jacqueline T. Colclough, Washington, DC, was on the brief, for appellant.

Karen R. Turner, Bethesda, MD, with whom Andrew J. Spence, Fairfax, VA, was on the brief, for appellees.

Before WASHINGTON, Chief Judge, and KRAMER and OBERLY, Associate Judges.

OBERLY, Associate Judge:

Appellant Jyothsna Mody sued appellee Dr. Anita Sikand and Sikand's professional corporation, Center for Women's Health, alleging that Dr. Sikand negligently performed a medical procedure that caused perforations in Ms. Mody's uterus and bowel. A jury returned a verdict in favor of Dr. Sikand and the Center for Women's Health. On appeal, Ms. Mody argues that the trial court erred in denying her motion for a new trial in which she asserted that the court abused its discretion in conducting *voir dire* and that the jury verdict was against the weight of the evidence. In addition, she argues that the court abused its discretion in awarding some of the costs sought by appellees, including certain copying charges, certain unusual costs associated with the taking of one deposition, and certain filing fees. We conclude that the trial court did not err in denying Ms. Mody's motion for a new trial, but reverse certain of the costs awarded and remand

to the trial court to revisit the findings supporting the award of those costs.

## I. Facts

After seeing Ms. Mody as a patient in November 2005 in her Washington, D.C., office, Dr. Sikand recommended that Ms. Mody "undergo a diagnostic hysteroscopy, polypectomy, and dilation and curettage in order to remove [two endometrial] polyps" that Dr. Sikand had detected in Ms. Mody's uterus. Ms. Mody consented to having the procedure, and in January 2006, Dr. Sikand performed the operation, removing two polyps from Ms. Mody's uterus with polyp forceps and then scraping the uterine lining to obtain tissue for a biopsy. Dr. Sikand testified that it was her routine when she had performed this same procedure in the past to "look back" at the uterus with a small scope after she had removed the polyps to make sure that she had not perforated the uterus with any instruments. In Ms. Mody's case, Dr. Sikand's post-operative notes did not mention that she had looked back, although Dr. Sikand testified that she must have looked back because she had taken a series of photos with a scope during the procedure, and the final photo in the series could have been taken only after she had removed the polyps. After the procedure, Ms. Mody recovered for several hours at the hospital and was discharged the same day.

Two days later, Ms. Mody called Dr. Sikand's office because she had become concerned about her inability to take in food and fluids. Ms. Mody described to Dr. Sikand the symptoms she was experiencing and Dr. Sikand advised Ms. Mody to "ambulate more" and to call back if the symptoms persisted. Later that same day, Dr. Sikand received a phone call from the hospital's pathology department telling her that tests on the specimens taken during the procedure showed that a segment of Ms. Mody's bowel was included in the tissue removed from Ms. Mody's uterus. This information led Dr. Sikand to suspect for the first time that during the procedure she had accidentally perforated Ms. Mody's bowel.

Dr. Sikand immediately called Ms. Mody and instructed her to go to the emergency room at the hospital where Dr. Sikand had performed the procedure two days earlier. After undergoing tests in the emergency room, a surgeon (not Dr. Sikand) operated on Ms. Mody to close a perforation of her bowel. Ms. Mody was in the hospital for five days after this surgery and, in her complaint, alleged that she required medical care and treatment "for a significant period of time following this second surgery."

Ms. Mody subsequently commenced a medical malpractice action against Dr. Sikand and the Center for Women's Health in the Superior Court. At trial, each side presented expert testimony regarding the standard of care for the polypectomy. Ms. Mody called Dr. Richard Stokes. Dr. Stokes testified that the procedure employed required that the physician must "look back [into the uterus] with the scope," and that not looking back was a breach of the standard of care. Dr. Harry Johnson testified for Dr. Sikand, stating that the standard of care requires the physician to look back only if she had reason to suspect that an injury had occurred. Dr. Sikand testified that she normally looked back after performing this type of surgery, although she did not always record doing so in her post-operative notes, and that her notes of Ms. Mody's procedure did not reflect that she had looked back.

After two days of deliberations, the jury found that Dr. Sikand was not negligent and returned a verdict in favor of appel-

lees. Thereafter, Ms. Mody filed a timely motion for new trial, challenging the *voir dire* process employed by the trial court and also arguing that the verdict was against the overwhelming weight of the evidence. The trial judge denied the motion, and Ms. Mody appeals to this court.

## II. Issues on Appeal

### A. Framing of the *Voir Dire* Questions

Ms. Mody first argues that the trial court's *voir dire* process did not allow her to uncover potential biases that jurors might have had against her case or against medical malpractice cases in general. Ms. Mody initially proposed 43 *voir dire* questions that fit into eight broad categories: prospective jurors' personal knowledge of the case (questions 1–8, 27); physical challenges or personal commitments that might affect or prevent the venirepersons from serving (questions 9, 43); past employment related to the issues in the case (questions 10, 21–25); past medical conditions similar to Ms. Mody's (questions 11, 12); experience with personal injury or medical malpractice suits (questions 14, 15, 17–20, 32, 33, 36, 38); exposure to information about tort reform (questions 26, 29–31); feelings prospective jurors might have toward health care providers or other issues that might affect their ability to serve (questions 28, 37, 39–42); and, finally, several questions regarding the prospective jurors' ability to be fair (questions 13, 16, 34, 35). On appeal, Ms. Mody challenges the adequacy of the eleven questions the trial judge asked the prospective jurors— questions, she argues, that impaired her ability to flesh out prospective jurors' strong feelings or bias about tort reform, medical malpractice, and medical professionals. In particular, she complains of the trial court's refusal to ask the following three questions her counsel proposed that

the court ask for the purpose of exploring the panel's views toward medical malpractice:

26. Any member of the jury panel or their immediate family members or close friends belong to any organizations who promote tort reform?

28. Do any of you have strong feelings about lawsuits against hospitals or doctors because of anything you have seen, heard, read or experienced? (Have each juror responding affirmatively approach the bench and describe any information he/she may have on the issue).

29. Have you ever read anything in newspapers or in magazines, or seen anything on television about the so-called "medical liability insurance" crisis? (Have each juror responding affirmatively approach the bench and describe any information he/she may have on the issue).

The court declined to ask the questions as propounded by Ms. Mody's counsel and instead posed eleven questions of its own; the following four are relevant to Ms. Mody's challenge on appeal:

Question 4: Have any of you, any members of your immediate family or close personal friends been involved in as a plaintiff, defendant or witness in a medical malpractice lawsuit?

Question 5: Are any of you or are any members of your immediate family or close personal friends a lawyer or has anyone in this group studied law?

\*       \*       \*       \*       \*       \*

Question Number 9: Does any member of the jury panel have such strong opinions or feelings for or against allegations of medical malpractice or the award of money damages arising from those claims that you would have difficulty fairly deciding the facts of this case?

Let me just explain about question number 9.

I am not asking as a general matter whether you have feelings about medical malpractice lawsuits.

I am asking whether you have feelings that would keep you from being a fair juror in deciding this case? That is question number 9.

Question Number 10: Does any member of the jury panel have such strong feelings either positive or negative about healthcare providers, doctors, or hospitals that you would have difficulty fairly deciding a case like this? That is question number 10.

Again, I am not asking as a general matter whether you have feelings about the medical profession. I am asking whether you have feelings that are strong in any direction that you would have difficulty being a fair juror in this case?

Ms. Mody's counsel objected to the court's questions as they were asked, arguing that "the way [questions nine and ten were] said ... [they] emphasized only if you have a real problem and you won't allow it to be explored. We should be allowed to explore that up here when they come to the bench." Ms. Mody's counsel requested that the court ask the questions "more generally" because "[w]hile [the prospective jurors] may not answer the question [nine] affirmatively, up here [at the bench], we may be able to get information from them by the way that they say it and that indicates that they are either a strike for cause or it might be someone that I might decide to strike. But the way that the question was asked, it's not going to elicit any yes answers."

The court offered to re-word question nine to ask it in two parts: first, "[d]oes any member of the jury panel have strong feelings or feelings for or against medical malpractice cases and money damages arising from those claims?" and second, "as a result of those strong opinions or feelings, would you have difficulty fairly deciding the facts of this case?" Ms. Mody's counsel deemed this approach inadequate, contending that the prospective jurors should be asked simply whether they had strong feelings but not whether they had such strong feelings that their ability to be fair might be impacted; otherwise, she contended, the prospective jurors would be making their own decision about fairness, rather than leaving that determination to the court and counsel. The court denied Ms. Mody's request, reasoning that "I think that people have feelings and opinions that might be of interest to you about many subjects. But, the question really is do they have feelings or opinions that they believe ... would interfere with their ability to decide this case fairly? That's the question that I asked." The court decided to maintain the questions as originally asked and explained, "To the extent that [the prospective jurors] identify feelings, you will be able to inquire about them. But, to the extent that they have feelings that would not interfere with their ability to be fair, I don't think that is a relevant discussion for us today."

Although Ms. Mody feared that no member of the jury panel would admit to having such strong feelings that they would interfere with his or her ability to be fair, three prospective jurors answered questions nine and ten affirmatively. Juror 794 answered question ten in the affirmative because his mother had had surgery on her spine that resulted in paralysis, but when questioned by the judge about his ability "to be fair to both sides all of the way through and not to be influenced by [his] own personal experience," answered that he could do so. The court denied appellees' request to strike this prospec-

tive juror for cause because he said that he might have trouble staying awake during the trial, but for reasons unclear from the record, he ultimately did not serve on the jury. Juror 333 answered yes to questions nine and ten. He told the judge that based on his negative personal experiences with doctors, he "would not be objective about [the case]," and answered "yes" when asked whether, "in all instances, h[e] would presume that a doctor had been less careful than they [sic] should have been." The trial judge excused this panel member. Finally, Juror 444, a dermatologist, answered "yes" to questions nine and ten and when questioned at the bench, said that the fact that he was a doctor "might sway [him] in this case," and that he "would have trouble being fair to both sides." The court excused him from service. Although not answering yes to questions nine or ten, Juror 375 did answer questions four and five affirmatively, stating that her father was a doctor and had been sued for malpractice, and that she herself had worked for the American Trial Lawyers Association (ATLA) on medical malpractice issues. Although both parties asked follow-up questions, neither asked this prospective juror about her ability to be fair. She was not seated on the jury for reasons unclear from the record.

During the court's questioning, Ms. Mody's counsel did not move to strike any members of the jury panel, nor did she ask follow-up questions of the prospective jurors who had answered yes to questions nine or ten. After *voir dire,* both parties had the opportunity to use peremptory challenges to strike members of the jury panel.

■ We review a ruling on a motion for a new trial for an abuse of discretion. *Oxendine v. Merrell Dow Pharm., Inc.,* 506 A.2d 1100, 1110 (D.C.1986). " "The trial court has broad discretion in conduct-ing *voir dire* ... and its rulings will not be disturbed on appeal absent an abuse of discretion and substantial prejudice to [a party]." " *Lewis v. Voss,* 770 A.2d 996, 1005 (D.C.2001) (quoting *Jenkins v. United States,* 541 A.2d 1269, 1272 (D.C.1988)). Substantial prejudice to a party exists in the context of *voir dire* "when 'the procedure used for testing impartiality does not create a reasonable assurance that [juror] prejudice would be discovered if present.' " *Murray v. United States,* 532 A.2d 120, 123 (D.C.1987) (quoting *Cordero v. United States,* 456 A.2d 837, 845 (D.C.1983)) (internal editing omitted). In essence, "[t]he question before us ... is whether [a party] had enough information to make effective use of her peremptory challenges." *Id.*

■ In this case, we see no abuse of discretion in the trial court's limiting the *voir dire* questions. The trial court asked eleven questions that elicited information about the prospective jurors' broad experience with medical malpractice lawsuits (question 4), their contact with the law or lawyers (question 5), and their "strong feelings" about medical malpractice, the award of money damages for medical malpractice claims and healthcare providers (questions 9 and 10). "Just because a particular issue in a trial might conceivably prejudice some venire members against a [party], the [party] does not always have a right to *voir dire* questions specifically directed to that issue. Moreover, if a court decides to ask a *voir dire* question suggested by a [party], it is not obliged to ask the question exactly as proposed; instead, the court may alter the wording and make it more general." *Boertje v. United States,* 569 A.2d 586, 593 (D.C.1989) (internal citation omitted).

In this case, the court revised Ms. Mody's proposed questions to allow the parties to explore any *relevant* feelings prospective jurors might have about the

case, but refused to let counsel go on a fishing expedition about other issues. We recognize that "[p]eople do not readily admit to bias, [or] states of mind that prevent the rendering of a just verdict or opinions which would improperly influence their verdicts," *Lewis*, 770 A.2d at 1005 (quoting *Malvo v. J.C. Penney Co.*, 512 P.2d 575, 583 (Alaska 1973)), but three prospective jurors did just that: they admitted that they could not be fair because of their strong feelings and ultimately did not serve on the jury. "[W]e are satisfied that the question[s] ultimately asked by the court sufficiently probed the prospective jurors' ability to be impartial." *Boertje*, 569 A.2d at 593.

## B. Denial of Ms. Mody's Challenge to the Weight of the Evidence

■ Ms. Mody next argues that the trial court should have granted her request for a new trial because the jury verdict was contrary to the overwhelming weight of the evidence. According to Ms. Mody, "[a]ll experts for both parties agreed that … a practitioner should re-examine the [uterine] cavity in the event that a perforation is suspected, and that a perforation can be detected by a practitioner upon re-examination of the uterine cavity." The central question for the jury, as Ms. Mody sees it, was whether Dr. Sikand breached the standard of care if she re-examined the uterine cavity and yet did not see the perforations of the uterus and intestine.

■ "Our scope of review is especially narrow when the trial court has denied a motion for new trial, thereby sustaining the jury's verdict," *Oxendine*, 506 A.2d at 1111. Here, the trial court did not abuse its discretion in declining to disturb the jury's verdict, which was consistent with the evidence at trial. Dr. Sikand's expert, Dr. Johnson, testified that Dr. Sikand was required to perform the look-back proce-

dure only if she suspected she had perforated the bowel. Ms. Mody's expert, Dr. Stokes, differed to some extent, testifying that Dr. Sikand was required to look back, whether or not she suspected a perforation. Dr. Sikand testified that she did not suspect a perforation but, in any event, she believed that she performed the look-back procedure, even though her post-operative notes were silent on that score and, outside of those notes, Dr. Sikand did not have an independent memory of Ms. Mody's procedure. As the trial court concluded in its denial of Ms. Mody's motion for a new trial, "A reasonable jury hearing the evidence in this case was entitled to credit Dr. Sikand's testimony that she did not suspect perforation and to credit Dr. Johnson's testimony that the standard of care did not require Dr. Sikand to look back in the circumstances." Given the evidence presented, the jury may have found that Dr. Sikand did not perform the look-back procedure, but that she did not breach the standard of care by failing to do so because they credited her testimony that she did not suspect any perforation. Such a conclusion would not be against the weight of the evidence, and we do not fault the trial judge for refusing to overturn the verdict.

## C. Costs

Ms. Mody's final challenge is to the trial court's partial grant of appellees' motion for costs. Appellees petitioned the court for an award of costs pursuant to D.C. Superior Court Rules of Civil Procedure 54(d)(1) and 54–I, seeking costs for photocopying ($5,780.36), depositions ($5,963.75), filing fees ($392.68), and statutory witness fees ($85), for a total of $12,221.79. The trial court instead awarded appellees $11,485.13, reducing by $731.66 the costs sought for undocumented "in-house copying" and deducting $5 for witness fees that exceeded the amount allowed by law. On

appeal, Ms. Mody argues that the trial court abused its discretion by not making further reductions because some of the copying charges allowed were unnecessary, the videoconferencing costs associated with one deposition were excessive, and three of the filing fees charged by appellees were for "personal" motions not properly taxable to Ms. Mody.

■ We recognize, of course, that "[t]he award of costs to the prevailing party under Super. Ct. Civ. R. 54(d) is within the trial court's discretion and may only be overturned upon our finding that the exercise of such discretion was an abuse. The trial court's discretion lies in whether or not to award as costs items specifically authorized by [statute or court rules]," *Talley v. Varma*, 689 A.2d 547, 555 (D.C.1997) (internal citations and quotation marks omitted), and "this court must not substitute its own discretion" for that of the trial court. *Harris v. Sears Roebuck & Co.*, 695 A.2d 108, 110 (D.C.1997). Nonetheless, for the reasons set forth below, we conclude that the trial judge did not adequately explain the propriety of some of the costs awarded and we therefore remand the costs award for a more detailed analysis of some of its components. We analyze Ms. Mody's challenge to each of the elements of the costs award below.

■ First, Ms. Mody does not dispute the award of copying costs as a general proposition, but argues only that some copying was not necessary to the preparation of the case. Ms. Mody points out that appellees retained and made copies of documents to prepare three experts, only one of whom testified at trial, and that had all three testified, their testimony would have "substantially overlapp[ed]." Ms. Mody asks us to find an abuse of discretion in the trial court's assessment that copying documents to prepare three witnesses to testify was "reasonably necessary to defendants' preparation of the case." That we cannot do.

In hindsight, it may be that the experts' testimony would have overlapped, but that is not the standard under which the trial court makes its award of costs. As the trial judge noted in her award for deposition costs for these same experts, "necessity ... must not be viewed from hindsight, but rather from the perspective of counsel at the time the deposition [was] taken, since counsel will then not necessarily know what will be the contested or disputed issues of fact at trial and/or how a deposition may be used to prepare the proponent's own case as to trial tactics or strategy, or as substantive evidence to fill in gaps or corroborate other evidence, or how such a deposition may be used for effective cross-examination." Thus, the relevant question is not whether, in retrospect, copies used to prepare each of these three witnesses were necessary, but whether trial counsel acted reasonably in preparing three witnesses for trial even though it ultimately turned out that not all three were called. We cannot fault counsel on this score, particularly when we consider that the trial judge did not decide to exclude one of the witnesses from testifying until the day of trial. We therefore conclude that the trial court did not abuse its discretion in awarding these copying costs.

■ Second, Ms. Mody asserts that the trial court abused its discretion in awarding $1,312.50 for copying medical illustrations because the illustrations were inaccurate, and that this inaccuracy was entirely appellees' fault. Appellees argue that the medical illustrations, even if inaccurate, were "a necessary part of their case preparation," and should be taxable without regard to whether the illustrations were used at trial. We disagree.

The trial court awarded costs for photocopying charges in the aggregate without discussing the medical illustrations, and did not address Ms. Mody's argument that she should not be taxed for the cost of the illustrations because appellees agreed even before trial that the illustrations were inaccurate and would not be used at trial. As such, we must remand because we cannot conclude that the trial court exercised its discretion with regard to this expense. *See Davis v. Davis*, 957 A.2d 576, 582 (D.C.2008) (amended opinion) (" '[f]ailure to exercise choice in a situation calling for choice is an abuse of discretion' ") (quoting *Johnson v. United States*, 398 A.2d 354, 363 (D.C.1979)); *Quick v. Paregol*, 68 A.2d 211, 214 (D.C.1949) ("A failure to exercise discretion has the same effect as an abuse of discretion."); *see also Harris*, 695 A.2d at 110 ("Where a statute allows for specified fees, the trial court is obligated to exercise its discretion in deciding whether or not to award such fees.").

■■■ Third, the trial court awarded $3,115 for videoconferencing services used to depose Ms. Mody's sister, Sajahtah Bhat, who resided in New Delhi, India. The total amount included a network fee ($1,395) and a "premium videoconference room" fee for rooms in Washington, D.C. ($550) and New Delhi ($1,170). Ms. Mody concedes that it was appropriate for appellees to depose Bhat because Ms. Mody had listed Bhat as a potential fact witness, but Ms. Mody argues that the videoconferencing method chosen by appellees was "extravagant" and should not be taxable against her. Ms. Mody notes that the Bhat deposition lasted barely an hour and produced fewer than 50 pages of transcript at a cost of $220.90 (in addition to the $3,115 billed for the videoconferencing services). By way of comparison, she notes that Dr. Sikand's videotaped deposition was taken for approximately two hours, and produced nearly 100 pages of transcript at a cost of $280.50 for the transcript plus a $65 fee for videography.

■■■ Although a prevailing party is entitled to recover its taxable costs, under Rule 54 a trial court has "discretion over the allowance, disallowance, or apportionment of costs in all civil actions." *Esso Standard (Libya), Inc. v. S.S. Wisconsin*, 54 F.R.D. 26, 27 (S.D.Tex.1971). "Circumstances justifying denial of costs to the prevailing party or the assessment of partial costs against him may exist where the amount of taxable costs actually expended were unnecessary or unreasonably large." *Id.* Here, the $3,115 awarded for "videoconferencing services" for a single deposition constitutes more than 25% of the total cost award. Moreover, appellees did nothing to explain why it was necessary for them to use the Lamborghini videoconferencing method they chose to take the witness's deposition, when a Hyundai might have been just as effective. At the time of the deposition, methods of conducting online videoconferencing without charge were available. For example, we take judicial notice of Skype, a popular service that allows people to make unlimited video calls over the Internet for free using just a web camera, many of which cost under $100, and a computer. *See* Ken Belson, *Popular Internet Telephone Service Adds Video to Voice*, N.Y. Times, Dec. 1, 2005, *http://www.nytimes.com/2005/12/01/ technology/circuits/01skype.html.*

We do not hold that appellees were required to use a service such as Skype, but we do hold that their decision to use the expensive alternative they chose must be explained on the record before the trial court may exercise its discretion to approve the expense. In defense of their request for $3,115 in costs for this single deposition, appellees asserted only that the technology employed and "[t]he means by

which the [Bhat] deposition occurred ... is not a decision that the plaintiff should be allowed to determine for the defense." That may be so, but neither should the defense expect to shift the costs of their decision to the plaintiff without any attempt at justification.

Although Superior Court Civil Procedure Rule 54–I(b) permits the award of "[c]osts of depositions," we think that a party requesting an award of $3,115 for a less-than-one-hour deposition that produced fewer than 50 pages of transcript should have provided at least some explanation for such high costs. *See United States v. Davis*, 87 F.Supp.2d 82, 88 (D.R.I.2000) ("A party seeking to tax the cost of a videotaped deposition must show the necessity of the videotaping and not merely convenience.") (citing *Barber v. Ruth*, 7 F.3d 636, 645 (7th Cir.1993)). Furthermore, the trial court did not explain its reasoning for awarding the videoconferencing charges over Ms. Mody's objections, finding only that "the videoconferencing costs were incurred reasonably and were necessary to the preparation and presentation of the case in that plaintiff identified Sajahtah Bhat, M.D. as a witness." As we have said before, if a statute or rule allows for the award of certain fees, the trial court must exercise discretion in deciding to award or deny those fees. *Harris*, 695 A.2d at 110. Here, we see nothing indicating that the court exercised its discretion, and therefore we must remand for further findings on the unique costs of this deposition. *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 717 (3d Cir.2005) (vacating an award of costs in part because the trial court approved without explanation copying costs of 20 cents a page, noting that the rate awarded was much higher than the rates that most federal courts deemed reasonable and taking judicial notice that "Fed Ex/Kinko's charges less than 7 cents per page for large volume copying," and remanding to the trial court for "fuller consideration").

██ Fourth, the trial court awarded $392.68 in filing fees, stating that the fees "are recoverable under Rule 54(d)." Ms. Mody objects to being taxed filing fees for three specific motions: a praecipe for counsel to withdraw appearance, a praecipe for counsel to enter an appearance, and an Amended Emergency Consent Motion. Court filing fees generally are taxable "as a matter of course," *Talley*, 689 A.2d at 555, but three months before the trial court issued its order awarding costs in this case, we issued an opinion holding that "[t]he filing fee for a *pro hac vice* motion is [a personal] 'expense of counsel for the privilege of practicing law in this Court,'" and, as such, was not taxable to the other party. *Nicola v. Washington Times Corp.*, 947 A.2d 1164, 1177 (D.C. 2008) (quoting *Romero v. United States*, 865 F.Supp. 585, 594 (E.D.Mo.1994)). As in *Nicola*, appellees' motions to withdraw an appearance and enter a new appearance were, like *pro hac vice* motions, "personal" expenses. Therefore, we agree with Ms. Mody that the trial court abused its discretion in awarding fees for the filing of these motions.

██ We also agree that it was an abuse of discretion for the trial court to award costs for appellees to file their Emergency Consent Motion twice. Ms. Mody argued in her brief that appellees were forced to file that motion a second time because the first filing was rejected by the court clerk; the Amended Emergency Consent Motion was an attempt to correct whatever formatting problems occasioned the rejection of the first motion. Appellees do not dispute Ms. Mody's characterization of this second filing. Under

these circumstances, we must vacate the award of the filing fees for this motion as well.

Accordingly, we affirm the trial court's ruling on the motion for new trial, but vacate the award of costs and remand to the trial judge for further proceedings consistent with this opinion.

*Affirmed in part, vacated in part, and remanded for further proceedings.*